**UNITED STATES ex rel. LEYRA**
**v.**
**DENNO.**
No. 54, Docket 22789.

United States Court of Appeals
Second Circuit.

Argued Oct. 5, 1953.

Decided Nov. 24, 1953.

Writ of Certiorari Granted
March 15, 1954.

See 74 S.Ct. 533.

Osmond K. Fraenkel, New York City (Frederick W. Scholem, New York City, on the brief), for petitioner-appellant.

William I. Siegel, Asst. Dist. Atty., Kings County, N. Y., Brooklyn, N. Y. (Nathaniel L. Goldstein, Atty. Gen., State of New York, and Miles F. McDonald, Dist. Atty., Kings County, N. Y., Brooklyn, N. Y., on the brief), for respondent-appellee.

Before CHASE, Chief Judge, and CLARK and FRANK, Circuit Judges.

CLARK, Circuit Judge.

■ This appeal is by Camilo Weston Leyra from the denial of his petition for a writ of habeas corpus wherein he asserted a violation of constitutional due process in his trial and conviction for murder and sentence to death in the

courts of the State of New York. His first trial and conviction, for murder of his parents, resulted in a reversal by a unanimous Court of Appeals of New York for improper admission of a confession. People v. Leyra, 302 N.Y. 353, 98 N.E.2d 553. A second conviction, for his father's murder,[1] was affirmed by a majority of the Court of Appeals, People v. Leyra, 304 N.Y. 468, 108 N.E.2d 673; a petition for a writ of certiorari to the Supreme Court of the United States was denied, Leyra v. New York, 345 U.S. 918, 73 S.Ct. 730, and thereafter an application for a rehearing was denied, 345 U.S. 946, 73 S.Ct. 835. Thereupon he brought a petition for a writ of habeas corpus to the district court, which Judge Ryan denied in a reasoned opinion reported in Leyra v. Denno, D.C.S.D.N.Y., 113 F.Supp. 556. This appeal followed.

The issue here concerns the use in the trials of confessions by petitioner to the brutal hammer murders of his elderly parents. As presented on the second appeal, after the first appeal had established the invalidity by reason of mental coercion and promises of leniency of a confession made to a Doctor Helfand, the question was whether this invalidity also permeated certain other and later confessions, which the jury considered and by their verdicts held to be freely made, to such an extent that as a matter of law they, too, must be held invalid. Since a majority of the state Court of Appeals has held that the issue as to their voluntary character was correctly submitted to the jury, the question before us is narrowly whether that ruling as to the nature and state of the evidence was so unjustified as to be a denial of due process of law requiring federal interference to protect petitioner in his constitutional rights. Whatever of anomaly there may appear to be in a bench of one or more federal judges thus reviewing a decision to which in all details an outstanding state tribunal has given the most careful and conscientious attention, there can be no doubt of our duty to do just this; indeed, it is often reiterated in Supreme Court opinions, of which the latest are Brown v. Allen, 344 U.S. 443, 458, 507, 508, 73 S.Ct. 397, 437, and Stein v. New York, 346 U.S. 156, 170, 180–182, 73 S.Ct. 1077. We cannot escape the heavy responsibility involved in this review.

We therefore turn at once to the confessions which precipitated the issue. We need not deal with the details of the crime, which are sufficiently described in the state court opinions. It appears that after discovery of the bodies of the Leyras as found in their home, made in fact by petitioner, he came almost immediately under suspicion. After two days and a night of intermittent questioning in the custody of the police, and after his complaints that his sinus was bothering him, petitioner was introduced to a Dr. Max Helfand, physician and psychiatrist. Dr. Helfand was unconnected with the police department, but, unknown to petitioner, had been summoned and briefed by the District Attorney. Left alone with petitioner in a wired room, they talked for an hour and a half, while the police listened to and recorded the conversation. The statements thus elicited from petitioner were admitted at the first trial and were the basis of the reversal, where they were held to be coerced as a matter of law. They were brought into the second trial partly by petitioner in attempting to show that details of later confessions had been planted in his mind by Helfand, and the rest by the State in rebutting this contention. This testimony was properly isolated in the charge to the jury as bearing only on the voluntary nature of later confessions, and its admission is not here in issue.

At the close of the case the trial judge charged that the statements elicited by

---

1. He was actually convicted for murder in the first degree of his father, and murder in the second degree of his mother; an appeal from the latter conviction (we are told) is pending in the Appellate Division, Second Department, of the New York Supreme Court.

Helfand were, as a matter of law, induced by coercion, and hence not to be considered on the issue of guilt. He further charged that, as a matter of law, the statements were induced by an authorized promise of leniency and were therefore invalid. In general the two invalidating factors of mental coercion and inducement by promise were linked together in the judge's references to them, as where he told the jury "that you are bound to consider the established fact that Dr. Helfand practiced illegal coercion upon the defendant and made authorized promises of leniency to him. The presumption is that such coercion and promise of leniency continued to affect the defendant's later confessions; unless the prosecution has convinced you, beyond a reasonable doubt, from all the credible evidence in the case, that such coercion and promise of leniency did not extend over and affect the later confession made to Meenahan. Unless you are so convinced, the later confession made to Meenahan must be entirely disregarded and not considered by you as evidence of guilt." But since, as noted below, the issue has developed more specifically with respect to the effect of the promise, it is well to note exactly what appears to be the one instance where the judge did treat this, at least comparatively speaking, as a separate matter, viz.:

"I charge you, gentlemen, as a matter of law, that the so-called Helfand confession was not voluntarily made; that it was due to mental coercion practiced by the physician upon the defendant. That, in and of itself, renders it worthless as evidence of guilt. It may not be regarded by you, even in the slightest degree, as any evidence of guilt. I charge you also, as a matter of law, that this so-called Helfand confession is invalid and may not be considered by you as evidence of guilt, on the further ground that Dr. Helfand, who was then acting for the District Attorney, made a promise to the defendant in order to induce him to confess, and, thus, did induce him to confess by reason of such promise; the said promise being, in effect, that if he made such confession, he, the defendant, would not be prosecuted for the capital offense of murder in the first degree, but, possibly, for a lesser crime. Therefore, it is now clear that the Helfand confession may not, under any circumstances, be considered by the jury as evidence of guilt. The Helfand confession becomes material with regard to another problem which I shall discuss with you later."

This other problem with regard to which the confession to Dr. Helfand did become material was, as stated above, that of carry-over of the invalidating factors to affect the other confessions. This problem developed because on the first appeal the court, differentiating the accused's responses to Dr. Helfand (the so-called Helfand confession), had said that whether the coercion found implicit in the accused's statements to the doctor carried over and into the later confessions was a question of fact for the jury which there had never been properly submitted to it. People v. Leyra, supra, 302 N.Y. 353, 365, 366, 98 N.E.2d 553. So the second trial was devoted substantially to the question of the admissibility of the later confessions, the first one to Police Captain Meenahan, the next (with the police out of the room) to the accused's business associate Herrschaft, and the final one in extensive narrative to two assistant district attorneys. Not all of these stood on the same basis. The one to the police captain, directly following the activities of Dr. Helfand, was naturally the most vulnerable. The testimony of Herrschaft, to whom he said, "I did it," while not necessarily showing premeditation, was, on the other hand, the most natural; the dissenting judges did not question the jury's finding as to the voluntary character of these statements and no issue is raised as to them here. Moreover, they well might have bearing on the other confes-

sions; thus counsel for the respondent stresses petitioner's failure to complain to Herrschaft, his associate and friend, that he had been coerced to confess to the police captain. And the later statements to the assistant district attorneys, made according to their testimony when his demeanor was normal and when he was cool and calm and told the entire story, might well be regarded as of persuasive effect.

■ In addition to the testimony of the various participants in or witnesses to the confessions—with the exception of the accused, who did not take the stand in the second trial—there was extensive testimony by two qualified psychiatric experts as to the possibility of a carry-over of the mental coercion and promise of leniency made by Dr. Helfand to affect the later confessions. The two experts differed pretty completely; the one for the accused gave his view that there would be such a carry-over, while the contrary conclusion was expressed by a doctor appearing for the State, who was cross-examined in great detail and at length when offered both in chief and on rebuttal. While the first questions put to these doctors were framed in terms of explicit reference to the mental coercion, yet upon direct prompting of the court they were extended to and did specifically include the effect of the promises.[2] There can be no

2. The testimony of Dr. Murphy, the expert for the prosecution, is now being attacked, with a suggestion that he substantially took back this testimony toward the close of his examination. Such a contention might perhaps have been urged to the jury, but seems wholly unjustified when carried to the point of a ruling of law eliminating his testimony. The acceptance of Dr. Murphy's testimony by the jury may well have been a consequence of confidence inspired by his care not to make overdogmatic assertions; indeed, his first response was to deny knowledge with "reasonable certainty" of the effect of even the mental coercion, and to make it clear that he was only expressing his opinion. Another reason may have been that the unusually searching cross-examination to which he was subjected led to his buttressing of his opinions by careful and precise detail as to the attitude and response of the accused under the various circumstances of the several confessions and explanation of the reasonable deductions to be made therefrom. This detailed proof was of course as directly pertinent to the effect of the promises as to that of the threats. Specifically as to the promises, in addition to various repetitions of the thought that the accused had "a free will to say what he wanted," exercised in fact with "voluble details," etc., Dr. Murphy testified explicitly as to the Meenahan and Herrschaft confessions that, while it was impossible to give a definite answer, yet "I don't think that the effect of that would carry over, no, I don't." Then the immediately succeeding cross-examination reiterated questions based at times upon the promises alone and the doctor re-

peatedly answered to deny that a carry-over effect was a necessary inference. And he specifically stated as to the Herrschaft statement that he thought it "voluntary"—"given freely because he chose to do so." And at one time after commenting on the "awful lot of confusion in this court about what is mental coercion" he made this statement, which is particularly pertinent in view of the present attempt to separate threats and promises: "Mental coercion—the words in this court are so loosely used. It is kicked around like a football, anything from a tiny bit of a dog to a boy stealing cookies, the urging such as a mother or father, urging the kid to tell if he stole cookies, or perhaps urging the person to go to the authorities and give himself up. Those are mild forms of coercion, which in my mind are not actual coercion because that individual has free will to choose to take the advice or not. They are usually in the form of persuasion. They might also depend upon the person's prestige who has been doing the interrogation."

Later, in response to pressure from the court, he did say, confining his response to "that particular instance" which was the interrogation of the accused by the assistant district attorneys *after* the Herrschaft confession, that "I don't know what effect the promise had. It is a thing which is something I cannot pass judgment on." It is not entirely clear why he so circumspectly thus isolated this one confession; and appropriate evaluation of his answer would seem properly a question of fact and not of law. But reasonable inferences may be suggested. Much earlier the cross-exam-

doubt that, if expert testimony is competent to do so, these doctors did create a conflict in the evidence justifying submission of the issue of voluntary character of the later three confessions to the jury. It was so submitted under a very full charge and the verdict of the jury may, we believe, be taken as settling the issue.

So far as affects the issue of mental coercion this seems to be accepted. But as to the issue of inducement by promises a very able dissenting opinion by Judge Fuld, concurred in by the late Chief Judge Loughran, presents a special problem. Judge Fuld says that when the judge charged that Dr. Helfand had promised the accused, to induce him to confess, that he would not be prosecuted for first-degree murder, and that this was authorized by the district attorney and induced the confession, which was therefore inadmissible as a matter of law under N.Y.Code of Criminal Procedure § 395, that charge became "the law of the case" and it follows . "as a matter of ineluctable logic" that all other confessions to the district attorney or his representatives must also be deemed to have been induced by the promise and be likewise inadmissible. "Accordingly, when the court further instructed the jury that it might find that the confessions to assistants of the district attorney and to a police captain—made within an hour or two after immunity had been promised—had not been induced by the promise, it pursued a course that was not only opposed to logic, but incompatible with the law of

the case. That was error highly prejudicial to defendant." People v. Leyra, supra, 304 N.Y. 468, 473, 108 N.E.2d 673, 674.

There is no doubt of the force of the picture thus deftly etched; but we think Judge Dye for the majority has given the answer, at least so far as constitutional due process is concerned. In the last paragraph of the opinion, 304 N.Y. at page 472, 108 N.E.2d 673, 674, Judge Dye says that the law of the case can be taken only from the total effect of the charge as a whole and not from isolated statements, and that the charge, while excluding the Helfand confession quite completely, nevertheless specifically allowed the jury to pass on the validity of the other confessions from the standpoint of both coercion and inducement. And he ends with the significant statement that because the trial judge had *also* ruled the confession worthless, "because a promise had been made as a matter of law, did not in any way prejudice the defendant. It was, if anything, to his advantage." Three judges concurred in this opinion; another, Judge Froessel, concurred in the result in reliance upon N.Y.Code of Criminal Procedure § 542, which permits the court to give judgment "without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties."

While action by the New York Court of Appeals does not lessen our responsibility for re-examination of the question federal-wise, we do gain benefit

---

iner had demanded to know if he could tell "the condition of this man that he was in two years ago, yes or no," *i.e.*, at the time when the accused made answers to the assistant district attorneys. This was just after the witness had stressed that the accused did not have to be urged or led in making those answers. Thereupon the witness again limited his response to his cautious opinion based only on the record placed before him. So his later statement seems but another attempt (after wearying hours on the stand) to reiterate the caution for which the need was pin-pointed by the earlier

incident. Certainly even this testimony —and even if it be separated from the rest of his evidence—was contrary to the dogmatic opinion of the expert for the accused that the Helfand promises did carry over to control the later confessions. Were we now to say that this balanced testimony of Dr. Murphy, instead of presenting a jury issue, operated to remove from the jury all that had gone before, we should be setting a unique limitation upon the historic factfinding function of a jury in cases where a constitutional issue is raised.

from this careful consideration, not the less from the attitude of the fourth or concurring judge as from that of the three majority judges. For although he does not state his reasons explicitly, it seems obvious that his reliance on § 542 must stem from his conclusion that petitioner could not be considered harmed by an overfavorable charge. Our independent examination of the record leads us to a like result.

Of course if it must be taken as law for this case that Dr. Helfand on behalf of the prosecutor promised petitioner prosecution only on the charge of second-degree murder or less, in return for his confession, it would be difficult to see why a confession made shortly thereafter to Captain Meenahan, who took over the doctor's role, would not be as vulnerable as the admissions made to the doctor. This is the basis accepted by Judge Fuld, who therefore did not examine the nature of the evidence as to the promises. Whether we should have likewise concluded, had we been sitting as state judges of review, is not now important; for the majority rejected that conception of the law, and we can see no constitutional requirement that the trial judge's view must control throughout. Constitution-wise we are thrown back to the actual evidence and what it required. Looking at that, we do not think the trial judge's characterization of the inducement—quoted above—can properly be accepted in the extensive form claimed. It is to be noted that there the judge was giving his reason for his exclusionary ruling just made. But even if the reason can be raised to the dignity of the ruling itself, it went beyond the actual evidence in depicting a specific and clear-cut promise. The complete record of the doctor's entire performance shows no clear differentiation between threats and inducement and nowhere a specific and definite promise of a lesser charge as the reward for confession. True, the doctor's offensive activities produced certain statements of convenient vagueness from which a person of some sophistication in the law could have drawn that conclusion. Actually the accused never indicated in any way that he did make such a deduction, either in his response to the doctor's advances or in the testimony which he gave at the first trial.

Carefully examined, the record of what the doctor said and did shows an extensive intermixture of wheedling and threats to induce the accused to admit commission of the homicides in a fit of temper. In addition to reiterated minatory language, there were many instances of his having offered to help, of his being with the accused "a hundred per cent" provided the latter told the truth, and the like. Perhaps nothing makes the unspecific character of the threats and promises more apparent than the reference chiefly relied on to show the nature of the intended inducement, the most specific statement in the record:

"These people are going to throw the book at you unless you can show that in a fit of temper, you got so angry that you did it. Otherwise they toss premeditation in and it's premeditation. See?"

Without any thought of minimizing the despicable nature of the doctor's conduct, we do feel it necessary to conclude that there is no basis in the evidence for the sharp dichotomy between threats and promise at the basis of petitioner's appeal to us. We think the resume given by the court on the first appeal well states this intermixture of act, threat, and inducement, viz.: "Bearing in mind the undisputed setting in which this interview was arranged and recorded, while defendant was in custody of the police; defendant's physical and mental condition at the time, already alluded to; the psychiatrist, calling himself defendant's doctor, playing upon the latter's natural fears and hopes, pressing his hands upon defendant's head with accompanying commands, and suggesting details to an unwilling mind by persistent and unceasing questioning; informing defendant that he was not morally responsible; making deceptive

offers of friendship and numerous promises, express and implied; giving assurances in a pseudo-confidential atmosphere of physician and patient; and all the attendant circumstances taken together—this interview was a subtle intrusion upon the rights of defendant and was tantamount to a form of mental coercion, which, despite the good faith of the prosecution, we may not countenance here." People v. Leyra, supra, 302 N.Y. 353, 362, 363, 98 N.E.2d 553, 558.

On the record, therefore, it does not seem appropriate or justified to say that, while a jury issue was presented as to the carry-over effects of the mental coercion practiced by Helfand with respect to the later confessions, yet only a single conclusion, constitution-wise, was possible as to the inducements by promise. Both really stand together as parts of one single chain of conduct with a single purpose and hardly differing acts. And we conclude that both together present a single problem properly submitted to the jury. Indeed, there would seem little doubt as to the Herrschaft confession and the later statements to the district attorneys. But we think the same conclusion is to be reached as to the Meenahan confession. Before the jury was detailed testimony as to the petitioner's attitude and apparent physical condition both before the doctor and later with the police captain, the nature and form of his responses, and the effect which all this evidence made upon two trained experts. That they differed markedly in their conclusions made it all the more a matter for the jury who saw and heard them to decide on the facts; we, who must approach the matter only from the cold record, are not justified in presenting our lately developed guesses or even convictions as constitutionally the only true course for the jury and judges in the state courts to follow.

We therefore find no constitutional infirmity in the procedure followed in the state courts. Consequently the petition for a writ of habeas corpus was properly denied by the district court.

Affirmed.

FRANK, Circuit Judge (dissenting).

1. Defendant's position is this: (1) Dr. Helfand, acting on behalf and with the approval of the district attorney, promised defendant that, if he would confess, he would not be prosecuted for first degree murder; (2) these promises induced defendant's confession, made a few hours later on the same day, to two assistant district attorneys. Defendant contends that the State had the resultant burden of overcoming, by evidence, a powerful inference that the promises had such a continuing effect.

The trial judge so charged, saying: "I charge you that you are bound to consider the established fact that Dr. Helfand practiced illegal coercion upon the defendant and made authorized promises of leniency to him. The presumption is that coercion and promise of leniency continued to affect the defendant's later confessions." And the judge added that those confessions must not be considered as evidence of guilt "unless the prosecution has convinced you, beyond a reasonable doubt, that such coercion and promise of leniency did not extend over and affect" the later confessions.[1]

I think that charge was correct.[2] But I think the State introduced no evidence whatever to support a finding that the effect of the promises—as distinguished from the effect of the coercion—had worn off when the defendant made the later confession to the assistant district attorneys. In short, there was a complete failure to overcome the inference of a persisting influence of the promises, and, absent countervailing evidence, neither the jury nor anyone else could rationally disregard that inference. It seems to me, therefore, that the confession to these officials was vitiated, and that to allow the jury to consider it

---

1. See also other excerpts from the charge in point 2 of the Appendix to this opinion.

2. Except that I would substitute the word "inference" for "presumption."

amounted to a lack of due process.[3] For that reason, I think habeas corpus should be granted (with power in the State, of course, to try defendant again).

2. My colleagues reach a contrary conclusion. They rest it on an assertion of fact which I think the record flatly contradicts: They say that the two doctors so disagreed in their testimony about the subject of the promises' lasting effect as to "create a conflict in the evidence justifying submission * * * to the jury" of this crucial issue of fact. In other words, my colleagues assert that one of the doctors testified that Dr. Helfand's promises did not influence the confessions to the assistant district attorneys. But here is what the State-court record shows:

(a) Dr. Bellinger, the expert called by the defendant, testified that the promises had "carried over" to the confessions made to those officials.

(b) Dr. Murphy, the expert called by the prosecutor, testified at length that the coercion exercised by Dr. Helfand had no effect on his confessions to the Police Captain Meenahan and to the defendant's partner Herrschaft. He was then asked about the effect of the promises on the confession to the Assistant District Attorney. He answered, hesitatingly and confusedly, as follows:

"A. It is impossible to give a definite answer to that, I feel. The promises were made in the line of persuasion, just as promises were made to a little kid to be good in school, things like that. It has the same effect, but they would not be effective sufficient to incriminate a person who is trying to survive, trying to keep his skin, as it were.

"Q. In other words, the defendant— A. It would have to be—I don't think that the effect of that would carry over, no I don't."

Subsequently he was recalled by the State, on rebuttal, and, in response to a question from the prosecutor, stated that the confession to Herrschaft was "free of any influence caused by any promises of immunity." Immediately thereafter questions were put to him by the prosecutor and the judge with reference to the effect of the coercion and the promises on the confession to the assistant district attorneys. This entire colloquy reads as follows:

"*By Mr. Cone* (the prosecutor).

"Q. Now, doctor, this break having occurred through the effects of the defendant's meeting with William Herrschaft, would the resultant freedom from mental coercion and from the effects, if any, of the promise of immunity, continue to the time when the defendant made his statements to the district attorney, which I read to you a few minutes ago, so that his answers to the district attorney's questions, and statements made by the defendant, without specific question from the district attorney, were voluntary, free from mental coercion, free of any influence caused by any promise of immunity. Can you render an opinion regarding that question

**3.** See Lisenba v. California, 314 U.S. 219, 237, 62 S.Ct. 280, 290, 86 L.Ed. 166: "The concept of due process would void a trial in which, by threats or *promises* in the presence of court and jury, a defendant was induced to testify against himself. The case can stand no better if, by resort to the same means, the defendant is induced to confess and his confession is given in evidence." (Emphasis added.) See also Brown v. Allen, 344 U. S. 443, 476, 73 S.Ct. 397, 417: "He chose to speak, and he made that choice without a *promise of reward or im-*

*munity* having been extended." (Emphasis added.) Cf. Watts v. Indiana, 338 U.S. 49, 60, 69 S.Ct. 1347, 93 L.Ed. 1801.

See also Turner v. State, 203 Ga. 770, 48 S.E.2d 522; State v. Dena, 28 N.M. 479, 214 P. 583; State v. Lord, 42 N.M. 638, 84 P.2d 80, 84; People v. Rockola, 339 Ill. 474, 171 N.E. 559, 69 A.L.R. 852; State v. Ball, Mo.Sup., 262 S.W. 1043; People v. Bateman, 80 Cal.App. 151, 251 P. 335; State v. Ellis, 207 La. 812, 22 So.2d 181.

with a reasonable degree of certainty? A. I can.

"The Court: Can you state that with reasonable certainty?

"Mr. Cone: I just said that.

"Mr. Scholem: I object to the question.

"The Court: The objection is overruled.

"Mr. Scholem: As to that particular question.

"The Court: Overruled; that is one of the specific issues in this case that is being litigated.

"Mr. Scholem: Exception.

"Mr. Cone: I think, with the interruption, I had better perhaps put the question to the Doctor again.

"The Court: Did the Doctor answer the question?

"The Witness: Yes, I believe that the subsequent interrogation by the district attorney, following the confession to Herrschaft, was given out of his free will, voluntarily, with no evidence or coercion involved. Does that take care of that?

"*The Court: What about the promise?*

"*The Witness: I don't know what effect the promise had. It is a thing which is something I cannot pass judgment on.*

"*The Court: In that particular instance?*

"*The Witness: That is right.*[4]

"The Court: Anything else, Counsel?

"Mr. Cone: I think that will be all."

This is the last testimony of Dr. Murphy on that subject.

I submit that—with Dr. Bellinger testifying that the promises did carry over and Dr. Murphy, the State's expert, specifically saying he did not "know what effect the promises had"—there was no testimony to rebut the inference of the continuing influence of the promise or promises on the confession made to the assistant district attorneys. This, then, is not a case where there is a conflict in the evidence and a State-court determination of fact resolving the conflict, a determination to which (to say the least) we would have to give heed.[5]

3. My colleagues, however, advance another alternative suggestion which, as I understand it, is this:

Dr. Helfand's statements to defendant consisted of an intermixture of wheedling and threats; consequently, he gave no promise which properly can be differentiated or separated from the threats. The foregoing (my colleagues say or imply) has these consequences: (1) If it be true (as I think it clearly is) that the trial judge, the two expert witnesses, the prosecutor and defense counsel, all dealt with Dr. Helfand's statements as including a promise or promises which should be regarded as separate from the threats, then all those persons erred. (2) The jury had before it Dr. Murphy's testimony that the threats did not carry over to the confession to the district attorneys, and the jury so found. Therefore (my colleagues say or imply), in order to sustain the jury's finding that the promises thus did not continue to be effective, there was needed no evidence to that effect, since Dr. Murphy's testimony of the

4. Emphasis added.

5. See, e.g., Lisenba v. California, 314 U.S. 219, 237–238, 62 S.Ct. 280, 290, "Where the claim is that the prisoner's statement has been procured by such means" (*i.e.,* threats or promises) "we are bound to make an independent examination of the record to determine the validity of the claim. The performance of this duty cannot be foreclosed by the finding of a court, or the verdict of a jury, or both. *If the evidence bearing upon the question is uncontradicted, the application of the constitutional provision is unembarrassed by a finding or a verdict in a state court; even though, in ruling that the confession was admissible, the very tests were applied in the state court to which we resort to answer the constitutional question.*" (Emphasis added.)

carry-over of the threats sufficed for that purpose, despite the fact that he unequivocally testified he could not say whether or not the promises carried over to the confession to the district attorneys.

I think this suggestion untenable in the light of the following:

(a) Judge Leibowitz, the trial judge, no novice in a trial court,[6] repeatedly—while the testimony was being received as well as in his charge—treated Dr. Helfand's statements as involving promises not comprised in, or merely a subordinate aspect of, the threats. See the Appendix to this dissenting opinion.

(b) That Appendix also contains excerpts from Dr. Helfand's statements to the defendant. I think they demonstrate that Judge Leibowitz correctly interpreted them as including promises distinct from, and not merged in, the threats.

(c) The highest New York Court, in its opinion on the first and second appeals—People v. Leyra, 302 N.Y. 353, 98 N.E.2d 553 and 304 N.Y. 468, 108 N.E. 2d 673—has hinted at nothing to the contrary. My colleagues quote a portion of the opinion on the first appeal. But that opinion—302 N.Y. 353 at page 366, 98 N.E.2d at page 560—also contains the following:

"Another alleged infirmity in defendant's statement to the doctor is urged upon us. It is said that this statement contained promises of leniency which might be attributed, under the circumstances, to the District Attorney. Code Crim.Proc. § 395; People v. Kurtz, 42 Hun 335; People v. Reilly, 224 N.Y. 90, 120 N. E. 113. The court at first instructed the jury that 'There is no claim here that the District Attorney induced this defendant to make a confession upon the promise that he will not be prosecuted therefor.' Defendant's counsel duly excepted, and requested an appropriate charge from the court, which might elim-inate premeditated murder. After some colloquy the court agreed, withdrew its original instructions in this respect, and then charged the jury in effect that they had to find a promise of complete immunity by the doctor or none at all, and only if the jury found that the former induced the confession might they acquit. While this may have been inadvertent on the part of the trial court, this instruction, to say the least, was misleading and did not cure the original instruction excepted to by defendant and which the court agreed to correct, and may well have been detrimental to defendant, particularly in the light of the doctor's statement to him that; 'unless you can show that in a fit of temper you got so angry that you did it * * * it's premeditation. See?' People v. Mleczko, 298 N.Y. 153, 162, 81 N.E. 2d 65, Code Crim.Proc. § 528. Moreover, here again the jury should have been instructed to consider separately the later confessions, in the light of any promise that may have been made during defendant's statement to the doctor. Lyons v. State of Oklahoma, supra [322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481]."

The opinion on the second trial—304 N.Y. 468, at page 472, 108 N.E.2d 673 at page 674 contains the following, which clearly does not indicate that the promises were engulfed in or were but an aspect of the threats:

"The Trial Judge did not stop there but dealt with it in his main charge and we believe fully and adequately by pointing out again and again that as a matter of law the confession made to Dr. Helfand was not to be considered on the issue of guilt. Moreover, he was careful to instruct the jury as to the defendant's contention leaving them to say with what force and effect the 'coer-

cion and promise \* \* \* did in fact carry over and into each of the subsequent confessions' at the same time giving like instruction as to the People's contention, leaving it for the jury to say whether the later confessions made to other persons 'were entirely voluntary and not induced by any promise of leniency.' In this manner and by this means the defendant's statement to Dr. Helfand was effectively insulated from the jury for consideration on the issue of guilt and was made available to them for the sole and limited purpose of saying whether or not the later statements made to others were dependent in any way on coercion or inducement, coupled with the clear and positive instruction that if so found to be, it was 'worthless as evidence'. Such submission for separate consideration was in obedience to our specific ruling at the prior trial."

(d) The prosecutor and the State's attorney general—in their briefs in the State courts, in their answer to defendant's petition for certiorari, in their brief and oral argument in this court—have never even whispered this notion that no promises were made except as part of the threats.

(e) Federal District Judge Ryan, when denying habeas corpus, said nothing remotely of the sort in his opinion.

That threats accompanied the promises did not serve to swallow up the promises, but rather to underscore them. Every parent of a young child, every owner of a pet animal, combines assurances of penalties for undesired conduct and of rewards for desired behavior; the child or pet animal recognizes the difference. Jeremy Bentham in his book, *The Rationale of Reward* (first published in 1811), has a chapter entitled "Of Reward and Punishment Combined," in which he notes that, when such a combination is used by a government, each has its effect.[7] If a school announces that it will flunk any student with an average grade of less than sixty and will graduate any student who betters that average, one whose average is sixty or over will be astonished if told that the second part of the school's announcement was subsidiary to the first and therefore not to be taken seriously as a promise.

4. Relying on the testimony of Dr. Murphy and on the smooth and easy flow of the later confessions, the prosecutor convincingly argued to the jury that Dr. Helfand's coercive efforts had worn off and that defendant, during those subsequent confessions was calm, undisturbed by emotions which the threats had stimulated.[8] But the very fact that defendant was thus calm and collected in no way negates, but is entirely consistent with, the inference that he had the promises very much in mind, and, free of coercion, voluntarily confessed to the officials because of the promises. The more cool and collected he was, the more influential they became.[9]

---

7. See Bentham, Works, Vol. II, 189, 197. Bentham included in the "legal or political sanction" the threat of punishment or the promise of reward, made by the government. See Works, Vol. I, 261. See also Vol. III, 203; Vol. VI, 261. Here he seems to have followed Locke; see Cairns, Legal Philosophy From Plato to Hegel (1949) 357. Ulpian, Digest I, i., 1, had said that legal obedience is secured "not only by the fear of punishment but also by the hope of reward"; see Cairns, *ibid.*

8. In the prosecutor's summation, he said of the confession to the district attorneys, "(E)ven Dr. Bellinger had to ad-mit that in this entire confession, from cover to cover, there are not any more than two leading questions. All the rest flowed spontaneously. The spontaneity of that confession conclusively indicates the defendant's guilt."

9. In its brief in this court, the State concedes "that if appellant had admitted the fact of his confessions, and had contended that he was induced to make them by the promise of immunity, that promise would have bound the district attorney to prosecute him for manslaughter only." But, the State's brief continues, the defendant's position on his first trial—as shown by a portion of his testimony at

5. I thoroughly agree with my colleagues that a federal court has a most unpleasant duty when, in a case like this, it must pass on the constitutional validity of a decision rendered by the highest court of a State, particularly in a murder case. That duty is indeed unpleasant, since past experience shows that its exercise may stir up intense local resentment.[10] Nevertheless, obedient to our sworn obligation, as frequently construed by the United States Supreme Court, we must ignore the possibility of such resentment. In discharging that obligation, I think we should not be singularly astute to avoid interference with a State judgment, ordering that a human being be put to death, by resort to a determination of fact (favorable to that judgment) which the State Courts and the State officials have themselves not ventured to so much as even intimate. Moreover, to repeat, the record here does not sustain such a determination.

APPENDIX

1. *Excerpts from statements by Dr. Helfand to defendant*

"Q. If you tell us the details and come across like a good man, then we can help you. We know that morally you were just in anger. Morally you are not to be condemned. Right? A. Right.

"Q. But you have to tell us the details, then we will know that you are above board and on the level. Otherwise, we just don't do nothing to you and you will get the worst of it. * * *

that trial which was read to the jury at his second trial—was either that he had made no confessions at all or, if he did, that they were all procured from him during a period of unconsciousness. As defendant did not testify on the second trial, and as defense counsel in his summation did not take that position, the State seems here to be arguing that defendant is estopped by his position on the first trial. Surely that cannot be true. Nor can it be reasoned that the

"Q. You may as well tell us and we'll work with you. We'll play ball with you. We'll help you if we can * * *.

"Don't be afraid. We're all with you. We want to help you. * * *

"* * * [S]o you may as well tell us and get our help. If you don't tell us and get our help, I'll wash my hands of you."

"I'll help you Buddy, I am with you one hundred percent but you got to play ball with me. * * *

"These people are going to throw the book at you unless you can show that in a fit of temper you got so angry that you did it. Otherwise they toss premeditation in and it's premeditation. See."

2. *Judge Leibowitz's references to promises by Dr. Helfand*

"*By the Court:*

"Q. Dr. Bellinger, during the examination of the defendant by Dr. Helfand, Dr. Helfand on numerous occasions said to him, 'We will help you. We will help you. Play ball with us. They will throw the book at you. Premediation.' Do you recall all of that, which was repeated by counsel? A. Yes, sir.

"Q. In other words, Dr. Bellinger, they made a certain promise to the defendant, promise of leniency? A. Yes.

"Q. Now what I want to ask you is this: In your opinion, did that carry over to subsequent confessions? A. Yes, I think it did.

jury may properly have found, on the basis of defendant's testimony on his first trial, that, during his session with Dr. Helfand, the defendant was so unconscious that he did not know Dr. Helfand had made any promises. For the judge's charge did not leave it to the jury to make such a finding, and the judge himself did not so find. Obviously, we are in no position to do so.

10. See, e. g., United States v. Shipp, 214 U.S. 386, 29 S.Ct. 637, 53 L.Ed. 1041.

"Q. You say it did? A. I say in my opinion, it did.

"Q. It carried over, you say, to the confession made to Captain Meenahan? A. Yes, judge. * *

"Q. And did the promise also carry over to the District Attorney's confession? A. Yes, in my opinion, it did. It was all done the same night, and in the same room."

In his charge, the judge included the following:

"I charge you also, as a matter of law, that this so-called Helfand confession is invalid and may not be considered by you as evidence of guilt, on the further ground that Dr. Helfand, who was then acting for the District Attorney, made a promise to the defendant in order to induce him to confess, and, thus, did induce him to confess by reason of such promise; the said promise being, in effect, that if he made such confession, he, the defendant, would not be prosecuted for the capital offense of murder in the first degree, but, possibly, for a lesser crime. * * *

"In arriving at a solution of these problems, I charge you that you are bound to consider the established fact that Dr. Helfand practiced illegal coercion upon the defendant and made authorized promises of leniency to him. The presumption is that such coercion and promise of leniency continued to affect the defendant's later confessions; unless the prosecution has convinced you, beyond a reasonable doubt, from all the credible evidence in the case, that such coercion and promise of leniency did not extend over and affect the later confession made to Meenahan. Unless you are so convinced, the later confession made to Meenahan must be entirely disregarded and not considered by you as evidence of guilt.

"Let us now turn our attention to the so called Herrschaft confession. Gentlemen, the same elements must be considered by the jury, to wit: Was the confession made? Was it voluntary? Did the Helfand coercion and the promises extend over and affect this confession? Did the prosecution sustain the burden of establishing, beyond a reasonable doubt, that the coercion and promises did not carry over and affect the Herrschaft confession? * * *

"You must also be satisfied, beyond a reasonable doubt, that the promise of leniency made by Dr. Helfand did not carry over and induce and influence the making of this confession to the Assistant District Attorneys. * * *

"The defendant contends, with what force and effect, of course, it is for you to say, that the coercion and promise referred to did in fact carry over and into each of the subsequent confessions.

"The prosecution, on the other hand, contends that the coercion and promise by Dr. Helfand did not in anywise extend over into any of the confessions made to Meenahan, then to Herrschaft, and then to the Assistant District Attorneys; that the confessions so made to these persons were entirely voluntary and not induced by any promise of leniency."