David L. Malbin, J.
The defendant, Nathan Jackson, was indicted for the crime of murder in the first degree on June 23, 1960, for the killing of a police officer in the County of Kings while in the commission of a robbery.
On November 27,1960, he was convicted of murder in the first degree and sentenced to death by a Judge of the then County Court of Kings County, which since reorganization has become a part of the Supreme Court by an act of the Legislature effective September 1, 1962.
Appeals were taken to the various courts (10 N Y 2d 780, 10 N Y 2d 885, 10 N Y 2d 816,11 N Y 2d 798, 368 U. S. 949, 206 F. Supp. 759, 309 F. 2d 573) which ultimately resulted in a reversal of the judgment of conviction by the Supreme Court which pronounced its 1 ‘ landmark ’ ’ decision in the case of Jackson v. Denno (378 U. S. 368, decided June, 1964). The majority opinion by Mr. Justice White in effect declared the confession admitted in evidence against the accused violated the constitutional guarantee of due process of law, and mandated that the defendant was entitled to an adequate, reliable and independent determination of the voluntariness of the alleged confession, and that the hearing must be before the Judge alone, and that there must be a determination at the evidentiary hearing that said confession was established to be voluntary beyond a reasonable doubt before it can be submitted to the jury for their consideration.
*744 The method heretofore followed in the New York State court where the voluntariness of a confession was attacked, the trial court submitted that issue with the others to the jury. As indicated in the Jackson opinion and reviewing the procedure employed in the New York State courts, the Trial Judge made a preliminary determination of the voluntariness of a confession and excluded it if in no other circumstances could the confession be deemed voluntary. If the evidence presented a fair question as to its voluntariness, as where certain facts bearing on the issue wore in dispute or where reasonable men could differ over the inferences to be drawn from the undisputed facts, the Judge admitted the confession and left to the jury under proper instructions the determination of its voluntary character and also of its truthfulness. In Jackson (supra) the court held that it is a deprivation of due process of law to base a conviction, in whole or in part, on a coerced confession, regardless of its truth, and even though there may be sufficient other evidence to support the conviction (p. 376); even though there is ample evidence aside from the confession to support the conviction (Malinski v. New York, 324 U. S. 401; Stroble v. California, 343 U. S. 181; Payne v. Arkansas, 356 U. S. 560). The United States Supreme Court in the Jackson case left the choice to the prosecutor to either provide the defendant a full independent hearing before the court or proceed with a full trial de novo. In any event, the court stated: “It is both practical and desirable that in cases to be tried hereafter a proper determination of voluntariness be made prior to the admission of the confession to the jury which is adjudicating guilt or innocence. But as to Jackson, who has already been convicted and now seeks collateral, relief, we cannot say that the constitution requires a new trial if in a soundly conducted collateral proceeding, the confession which was admitted at the trial is fairly determined to be voluntary.” (Jackson v. Denno, supra, pp. 395-396.)
Following the Jackson case, the New York State Court of Appeals in People v. Huntley (15 NY 2d 72) adopted a set of rules to meet with the new requirement of a separate hearing as to the voluntariness of confessions. As to criminal trials to be held in the future, Chief Judge Desmond of the Court of Appeals in People v. Huntley (supra, p. 78) stated the following: “ We adopt for New York State the so-called Massachusetts procedure described in the Jackson v. Denno opinion at pages 378-379 of 378 of United States Report ‘ under which the jury passes on voluntariness only after the judge has fully and independently resolved the issue against the accused ’ and has made express findings upon the disputed fact question of voluntariness. We *745 favor the Massachusetts rule for several reasons, the first being that our State Constitution (art. I, § 2) mandates a jury trial of the issue of voluntariness. Another consideration supporting this choice is that the Massachusetts rule not only meets the demand of Jackson-Denno that ‘ a proper determination of voluntariness be made prior to the admission of the confession to the jury which is adjudicating guilt or innocence, ’ (378 U. S. p. 395) but also provides a defendant with an opportunity before the jury itself to challenge the confession.”
The Huntley case (supra, p. 78) further mandated that “ The judge must find voluntariness beyond a reasonable doubt before the confession can be submitted to the trial jury. The burden of proof as to voluntariness is on the People. The prosecutor must, within a reasonable time before trial, notify the defense as to whether any alleged confession or admission will be offered in evidence at the trial. If such notice be given by the People the defense, if it intends to attack the confession or admission as involuntary, must, in turn, notify the prosecutor of a desire by the defense of a preliminary hearing on such issue (cf. Code Grim. Pro., § 813-c).”
Pursuant to the directives and the rules prescribed by the Court of Appeals in the Huntley case, the District Attorney gave proper notice concerning the proposed offer of any confession or admission in evidence at the trial, and in turn the defense properly notified the prosecutor of its desire to have a preliminary hearing on such issue. Thereafter a preliminary hearing (before the panel of jurors was assembled) was conducted before the Trial Judge. The prosecution in support of its contention that the alleged confession was not secured in violation of the defendant’s constitutional rights or by coercion, physically or mentally, or in any manner contrary to law, sought to establish the confession to be offered against the defendant was voluntary and freely made by the defendant. In that connection four witnesses were called.
Sergeant Joseph Keenan, who was at the emergency room of the Cumberland Street Hospital at about 1:30 a.m. on June 14,1960, testified that he saw the defendant come out of the rear of a taxicab; that the defendant had a revolver in his hand and the Sergeant with his drawn revolver ordered him to drop his gun; that after he gave him a 11 frisk ” he saw the front of defendant’s clothes were bloodstained, he apparently had been wounded, and the defendant stated that he was shot and he asked for help. Sergeant Keenan further said that the defendant was on his feet and he was conscious, and when he and a brother officer took him to the emergency room, the defendant *746 lifted himself with his hand on the table; that the defendant pushed the officer away and took off his own outer garments. There was a belt strapped around the defendant’s shoulder holding a holster. The doctors ordered the defendant to lie down on the table so they could examine the wound. He was attended by two interns, a nurse and at least one attendant was present at the time. The doctor used an instrument to probe a stomach wound of the defendant; his blood pressure was also taken, and during this period the defendant was conscious.
Detective Kaile came into the hospital about 2:00 a.m. The Sergeant said he did not know that Patrolman Eamos, the deceased, was shot at Franklin Avenue and Fulton Street. The Sergeant said he spoke to the defendant in the emergency room. He stated that they took the defendant in custody because he was an armed man coming out of a cab, that he was able to walk on his own. He stated further that he did not see the defendant gasping or show a sign of weakness. He was with the defendant when he was taken into the X-ray room, and that they attached some sort of a bottle with something like a white liquid which was attached on a tube into the defendant’s arm. He said that while the defendant was in the X-ray room he saw the defendant change positions a couple of times without assistance, and the defendant complied with whatever he was asked to do. The Sergeant says he never advised him of his right that he might have an attorney nor was he advised by the police that he had a right to refuse to answer any questions that were asked of him or that any answers that he made might be used against him. In other words, he was never advised of his constitutional rights.
Detective Kaile questioned the defendant on two occasions, at 2:00 a.m. and also at 2:20 a.m. The detective stated that he went to the Cumberland Street Hospital at about 1:55 a.m. or 2:00 a.m. ; that he saw the defendant lying on a stretcher table and he was conscious and had a conversation with him. He said that he had previously learned that the patrolman, Eamos, had been removed to another hospital and that Eamos fired his revolver at someone. He said before he got to the hospital he thought that the defendant might be a suspect in the case. He stated he knew the defendant had bullet wounds in his abdomen. He said he looked at the defendant’s face and his eyes were opening and closing; that the defendant was not gasping nor writhing in pain; that he was calm; that he knew the defendant was in custody and under arrest and that he did not advise him of his constitutional rights regarding a lawyer or the making of any statement. He said the whole statement took about a minute and a half to two minutes. He said that he questioned the *747 defendant again at about 2:20 a.m., and that the defendant at that time was a prospective defendant. He did not advise him of his constitutional rights, did not warn him that he was not obliged to answer or that he had a right to confer with an attorney ; that the first time he questioned the defendant at 2:00 a.m., the defendant said he shot the colored cop, he got the drop on him; that at the second conversation he related how he came to the hotel and where he first met his female companion (who was a codefendant at the first trial and whose ease had been disposed of). In the second conversation he related some facts concerning the actual robbery in the hotel. Detective Kaile stated that the defendant did not say anything that was incoherent and made no requests of the detective.
The third prosecution witness, Inez Smith, testified she was a licensed practical nurse employed for 13 years at the Cumberland Street Hospital and that she had treated patients suffering from gunshot wounds before. She was on duty on this early morning, June 14, 1960, at about 1:30 a.m., and she recalls the defendant having been brought up into the room in Ward 46; that there was an intern present and also Dr. Suarez came into the room. She stated the defendant was very co-operative in moving him from the stretcher to the bed, she asked him to move over and he did so. She spoke to him and he responded and he was conscious. He knew he was in the hospital and used the word nurse and his speech was coherent. He was wide awake and his eyes were open. He asked for water and she told him he was being prepared for the operating room and could not have water, and the nurse indicated that this was routine, that she could not give anybody anything by way of mouth in a preoperative state. The doctor came into the wardroom and no medication was administered before the doctor came in. The doctor ordered intravenous fluid and it was given immediately to the defendant. She prepared the fluid for the doctor who administered it intravenously through the tubing. It contained saline solution. She further stated she took the defendant’s blood pressure on three occasions and the defendant was conscious at all times while his blood pressure was taken. He was alert and knew where he was and was talking quite a bit and she interrupted him in taking his blood pressure because he was dramatic in his talk; that he related how when the cop told him to give up, how he flipped him to the ground and let him have it. He said he shot him. She said that she came in and out of the room on various occasions to check on the Levine tube, the tube that was inserted into the nostrils which runs down into the stomach. She said that the defendant was suffering from gun *748 shot wounds of the abdomen. She said when the Levine tube Was inserted into his nostril he was co-operative. This is a tube that is attached to a suction machine which she said is used to remove the contents of the stomach.
The fourth and last witness called by the People in support of the voluntariness of the confession was Dr. Suarez, who testified he was admitted to practice medicine in the Commonwealth of the Phillipine Islands, that he was duly licensed to practice there since 1956, and since 1959, he was attached to the Cumberland Street Hospital; that he made an examination of the defendant who was conscious when he talked to him and he asked him how he obtained the wounds and the defendant said he did not want to tell him. He said the defendant was alert and knew he was in the hospital and he knew he was talking to the doctor. The doctor stated he had multiple gunshot wounds, one in the left upper abdomen and one in the right lower abdomen and one in the left lower back. There was blood on the bandages, but there was no active bleeding. He said that in examining the defendant he found a tenderness of the abdomen by touching his stomach. He took his blood pressure, which was 100/80. He ordered a saline infusion to be given intravenously to the patient, because it is ordered in every case where there are wounds. He stated they start that right away so that in case they have to give a blood transfusion all they would have to do was switch the tube to the blood and the blood would be started without losing any time. He stated that in the event a patient develops a severe hemorrhage and goes into shock, the needle is already established in the vein. The saline solution is a common solution, containing nine tenths of 1% of salt, the liquid consisting of distilled water or clear septic water. It does not affect the ability of the patient to think or affect his mental processes. The doctor ordered tetanus antitoxin given to prevent the development of tetanus. The doctor stated that that injection does not affect the mental processes, or the mind of a patient. The Levine tube, the rubber tube put into the stomach to prevent distension of the stomach after surgery, does not affect the mind or the mental faculties. The doctor further testified it would not cause such pain as would prevent somebody from functioning properly so as to affect his mental capacity.
Following is a brief reference to some of the questions and answers during the examination of the doctor at the hearing: [Material omitted for publication.]
That was practically all of the People’s testimony offered to sustain the burden placed upon the prosecution. The defendant Jackson was called as a witness and he testified he was in *749 a cab going to the hospital. He recalls struggling against unconsciousness at least twice. He did not remember getting out of the cab, but he remembered being assisted by the patrolman and the cab driver and a Negro in uniform and being put on :a stretcher and being taken to the elevator and then to the ward where he thinks there were other patients. He stated he was breathing loudly and gasping for breath, his lungs did not seem to fill up and he had an agonizing craving for water. He stated that he could not have any water. He said the patrolman was questioning him and he does not know what they were saying. He said other officers questioned him and he kept asking for water. He said he was given water at one time by a detective. He does not recall any questions that were asked. He said he had severe pain in his back and was breathing hard and fast, and one detective said he could not have any more water until he answered the questions they wanted him to answer. He remembered he had a tube in his nose, and it made him gag and he was very uncomfortable. He stated it was not painful, it was annoying. After he left the ward he did not remember anything from then on. he does not recall saying anything in the cab. He did not recall being in the X-ray room and he did not remember whether he lost consciousness or not. He did not remember talking to the nurse named Smith. He had no recollection of what he said to Detective Kaile, nor what he said to the uniformed man. He was in great pain and did not tell anybody about it. He wanted to be left alone. He does remember shooting and being shot at. He said he hailed a cab on Fulton Street going toward Borough Hall. He remembered telling the cab driver to take him to the hospital. He does not remember whether he had the gun in his hand when he arrived at the hospital. He remembers being assisted by the patrolman and the cab driver to the emergency entrance. He was wearing a shoulder holster. He thinks it was removed from him in the ward. He remembered the cab driver was a Negro. He said he knew he was taken to the ward in a hospital. He remembers the nurses and the doctor coming over to where he was. They were in white uniforms. He remembers several people asking him his name and he gave his name as Nathan Jackson. He remembers asking for water many times. He does not remember his blood pressure being taken. He remembers seeing a woman in the ward. He knew someone was probing his wound. He does not recall anything about the bottle referred to. He indicated he had a black jacket on and a grey shirt and slacks and a shoulder holster. He does not remember telling the police he was shot by Clifford Jackson. He also identified his own *750 signature on the hospital record when he consented to have the operation.
That was the proof offered by the defense, and then the People called in rebuttal the detective who testified that he never told the defendant he could not have any water.
The above was a brief summary of a hearing that consisted of about 350 pages and upon which the court is required to make its findings of fact and conclusions as to the voluntariness of the alleged confessions.
Defense objection during the pretrial hearing to the admissibility of the alleged inculpatory statements was predicated on the following grounds: (1) that the defendant was a principal accused; (2) failure to warn him of his right to remain silent, or to have the aid of counsel; (3) the circumstances under which the statements were made and the physical condition of the defendant at the time impaired the defendant’s ability to resist interrogation and comprehend circumstances. It was the contention of the People that when the defendant was first under arrest he was not accused of a crime but that he had been arrested for the possession of a revolver. The People further contend that there is no requirement in the law of the State of New York that the defendant should be advised of the Fifth and Sixth Amendments of the Federal Constitution and section 6 of article I of the State Constitution.
The precise claim of the inadmissibility of the alleged confessions in the case at bar may be narrowed to two propositions:
(1) Did the physical and mental condition of the defendant so impair his power to resist interrogation by his questioner, and did the possible subjective pain and suffering so weaken him physically, that it prevented a clear understanding of the inquiry to which he was exposed?
(2) Did the failure to advise him of his constitutional rights, more definitely, the failure of the police to advise the accused that he had a right to have an attorney (even though he had not requested one) and that he was not required to answer any question, and if he did, the statements made by him may be used against him and, in short, that he may refuse to answer any questions propounded to him or make any statements during this period?
The issue presented by failure to warn an accused has brought many conflicting views. There is no obligatory requirement of New York State law to warn an accused of his right to counsel and privilege to refrain from making a statement after his arrest. (People v. Randazzio, 194 N. Y. 147.) Unquestionably *751 under certain circumstances many occasions arise when a defendant must be advised of his right to the aid of counsel (N. Y. Const., art. I, § 6); and a flat refusal to answer a request of an accused would deprive him of his constitutional right against being compelled to give evidence against himself. (See People v. Noble, 9 N Y 2d 571.) In the Noble case, it was stated (p. 574): “ When a person under suspicion of crime is being questioned there is a vast difference between a mere failure to warn and a flat refusal to answer a proper inquiry as to his rights. * * * It offends against our concept of fairness. The defendant was entitled to an answer. * * * We regard the statement thus procured as an invasion of the defendant’s privilege against self incrimination.” The Court of Appeals has made concise and definite rulings regarding confessions in a line of cases that followed the Noble case; they directed the exclusion of confessions taken from the defendant. (See People v. Everett, 10 N Y 2d 500; People v. Lane, 10 N Y 2d 347; People v. Donovan, 13 N Y 2d 148, 153; People v. Failla, 14 N Y 2d 178.) The United States Supreme Court made its decision a constitutional requirement to be followed in the State court. (Escobedo v. Illinois, 378 U. S. 478.)
Involuntary confessions are excluded under section 395 of the Code of Criminal Procedure as well as by the Fourteenth Amendment to the Federal Constitution, which provides, in part, that no State shall “ deprive any person of life, liberty or property, without due process of law ”. (Richardson, Evidence [9th ed. Prince], § 334; Leyra v. Demo, 347 U. S. 556; Malinski v. New York, 324 U. S. 401; Ashcraft v. Tennessee, 322 U. S. 143.) As the Supreme Court has said a “ denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice * * *. Such unfairness exists when a coerced confession is used as a means of obtaining a verdict of guilt.” (Lisenba v. California, 314 U. S. 219, 236-237.)
The foregoing cases are distinguishable from those where post-arraignment and post-indictment statements that are even conceded to be voluntary are excluded. (People v. DiBiasi, 7 N Y 2d 544; People v. Waterman, 9 N Y 2d 561; People v. Meyer, 11 N Y 2d 162.) It is clear that the court frowns upon such conduct as disclosed in record of People v. Waterman (supra) when questioning the defendant after arraignment or indictment in the absence of counsel. The Court of Appeals said (p. 564): “ [it] impinged upon the defendant’s twofold rights to the assistance of counsel and to freedom from testimonial compulsion.” A review of the foregoing cases, however, lends no *752 support to the contention urged by the defendant Jackson in the case at bar. The recent case of People v. Taylor (22 A D 2d 524 [1965]) the Appellate Division, First Department, in unanimous decision reversed a conviction of murder in the first degree. It was claimed, among other grounds, that Taylor’s confession used against him on the trial was obtained after he asked privilege to see his family before being further interrogated by the police; the record shows he was denied this privilege and hence the confession was involuntarily obtained and inadmissible. The record presented a question of fact on that issue. In a Per Curiam opinion the court stated (p. 526): “ Upon such trial, not only this issue but that of voluntariness of the confession should be submitted to the jury. In advance of the trial of this latter issue, the court will determine the voluntariness of the confession as a preliminary matter in accordance with the procedure provided in People v. Huntley (15 N Y 2d 72). At the same time, following the same procedure, the court will hear testimony on the claim that the defendant, before his confession, requested and was denied permission to see his family who were at the same time at the police station seeking to see him. If the court decides, as a question of law, that the request was made under such circumstances, and denied, appropriate findings and conclusions of law should be made in respect thereto. If it resolves the question adversely to the defendant, then the question will be submitted, together with the issue of the voluntariness of the confession, to the trial jury.”
In People v. Green (23 A D 2d 500) it was stated that under the decisional law now applicable in this State the interrogation of an accused after his arrest, prior to his arraignment without advising him of his right to remain silent and of his right to an attorney, does not render inadmissible the statement obtained from the accused. (Cf. People v. Stanley, 15 N Y 2d 30.)
Following the Taylor case, the Court of Appeals in March, 1965 in People v. Gunner (15 N Y 2d 226) clearly and definitely decided the law controlling the precise question of right of warning to an accused person at the time of his arrest. It was contended in the Gunner case that it was incumbent upon the police to advise him of his right to refrain from answering any question and also his right to an attorney at that time. Quoting from the opinion of Judge Fuld (p. 233): “ The court finds this argument without merit; the majority is of the opinion that the rule heretofore announced in our decisions (see, e.g., People v. Failla, 14 N Y 2d 178, supra; People v. Donovan, 13 N Y 2d 148, supra; People v. Meyer, 11 N Y 2d 162; People v. Noble, 9 N Y 2d 571; People v. Waterman, 9 N Y 2d 561; People *753 v. DiBiasi, 7 N Y 2d 544) should not be extended to render inadmissible inculpatory statements obtained by law enforcement officers from a person who, taken into custody for questioning prior to his arraignment or indictment, is not made aware of his privilege to remain silent and of his right to a lawyer even where it appears that such person has become the target of investigation and stands in the shoes of an accused. Thus, the court answers in the negative the question posed but not passed upon in People v. Stanley (15 N Y 2d 30, 32) ”. (Emphasis supplied.)
Prior to the Taylor, Green, and Gunner cases, Shapiro, J., in People v. Agar (44 Misc 2d 396, 398) stated: “ Unless counsel is denied access to his client or the latter requests counsel, a confession or statement by a defendant, under the circumstances here present is admissible against him, and that he need not be cautioned that he has a right to counsel nor that anything he says may be used against him.” This ruling was also followed in People v. Langert (44 Misc 2d 399). Recently, the Court of Appeals in People v. Hocking (15 N Y 2d 973); and, People v. Livingston (15 N Y 2d 977) adhered to the ruling of the Gunner case.
However, an interesting question presents itself. Assuming arguendo, an accused is warned of his right to counsel, and he declines and refuses to have an attorney, should the investigation and interrogation cease and be deferred, even though the defendant desires to make a free and voluntary confession? It has been long established that counsel cannot be foisted upon a defendant. An accused has the right to represent himself at the trial or at any stage of the proceeding if it is established that he has an awareness of the situation that confronts him. Is the accusatory stage more critical than the trial itself? The accused when he so chooses may defend himself when the need for an attorney at a complicated trial may present many issues to which the answers may not readily be given by even a very competent lawyer. It will be necessary for the trial courts to abide the event of a final determination by the appellate tribunal.
There was absent any proof that a request was made for aid of counsel; nor was there evidence that the accused was warned of his constitutional rights to aid of counsel and his privilege against self incrimination. (IT. S. Const., 5th and 6th Arndts.) The court holds failure to warn defendant Jackson of his constitutional rights — that is, to aid of counsel and privilege against self incrimination at the time he made the alleged inculpatory statement — was not a deprivation of his sub *754 stantial rights, in view of the law as now constituted in the State of New York. (People v. Taylor, supra; People v. Green, supra; People v. Gunner, supra; People v. Agar, supra; People v. Langert, supra.)
Notwithstanding the recent decision of the Third Circuit Court of Appeals, this court will follow the decisional law as pronounced in our State Court of Appeals. Much controversy has arisen over the methods of law-enforcement authorities in the apprehension of persons accused of crime and the procedures now prevalent in procuring inculpatory statements from them. One such critical question that seems to have caused much judicial confusion is the diverse views expressed by the judiciary as to the effect of failure to warn an accused of right to aid of counsel, and of his privilege against self incrimination.
The drafters of those amendments to the United States Constitution, ever mindful of the rights of the people, have with great emphasis condemned any unlawful and unreasonable invasion of the private and property rights of an individual. It is likewise true and equally important to protect society from the dangers of those engaged in nefarious endeavors. The accused and his victim should both be protected and are entitled to equal consideration. (See Taylor v. United, States, 286 U. S. 1.)
Mr. Justice Cakdozo, over 30 years ago, in one of his many erudite and learned decisions, succinctly and prophetically stated in Snyder v. Massachusetts (291 U. S. 97, 122) delivering his decision: ‘ ‘ The law, as we have seen, is sedulous in maintaining for a defendant charged with crime whatever forms of procedure are of the essence of an opportunity to defend. Privileges so fundamental as to be inherent in every concept of a fair trial that could be acceptable to the thought of reasonable men will be kept inviolate and inviolable, however crushing may be the pressure of incriminating proof. But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true. * * * There is danger that the criminal law will be brought into contempt — that discredit will even touch the great immunities assured by the Fourteenth Amendment — if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free.”
Pre-Jackson-Denno, this court has followed Haynes v. Washington (373 U. S. 503). It would seem that the United States *755 Supreme Court in Haynes (supra) merely stated that the failure to warn a defendant and advise him of his right to remain silent is an attendant circumstance “ which the accused is entitled to have appropriately considered in determining voluntariness and admissibility of his confession.” (Haynes v. Washington, supra, p. 517.) Evidently the trend of the review courts is to go further than the opinion expressed in the Haynes case. In the recent case of Commonwealth v. Tracy, published in the United States Law Week of June 1, 1965 (Vol. 33, p. 2620) the majority opinion concluded that the Sixth Amendment does not bar admissions of incriminating statements obtained from a wounded murder suspect at the hospital where he was apprehended and interrogated even though he was not advised of his right to counsel. The attendant circumstances of each case are a controlling factor in the court’s determination. (Escobedo v. Illinois, 378 U. S. 478, supra.) Referring to the Massachusetts case (supra) the defendant Tracy, as in the case at bar, was questioned very briefly. The defendant Jackson was also treated with an awareness of his physical condition. As evidence of the conflict presently existing in the courts, the dissenting opinion in the Massachusetts case (supra) was not in agreement with the majority and interpreted the principle enunciated in the Escobedo case as not being founded on the coercion factor but rather on the failure to warn the accused of his right to remain silent, or given the opportunity to consult an attorney. We find diverse opinions by Judges in the same case, and in various jurisdictions it is obvious that the fact-finders in the trial courts are confronted with troublesome and vexatious problems. It is apparent in some jurisdictions the courts have held that the right to counsel does not depend on the request by the accused.
Chief Judge Biggs of the Third Circuit Court of Appeals, in Russo v. New Jersey, published in the United States Law Week (33 L. W. 2621) stated: “ While we recognize the split of opinion in the state courts on this issue, we note the reported decisions in the federal courts favorable to the view that we adopt here. Wright v. Dickson, 336 F. 2d 878 (9 Cir. 1964) * * *
1 ‘ We find ample judicial authority supporting the view that the right to counsel at the interrogation stage does not depend on a request by the person interrogated, although there are decisions to the contrary. In addition to the California decision, Dorado * * * the Supreme Court of Oregon in a case similar to the case at bar has held that the failure to warn the *756 accused of his right to remain silent requires that the confession be suppressed. State v. Neely, 395 P. 2d 557 (1964). * * * The appellate courts of Illinois, People v. Hartgraves, 202 N. E. 2d 33 (1964) 33 LW 2163, cert, denied, 33 L W3330 (1965); Maryland, Sturgis v. State, 235 Md. 343, 201 A. 2d 681 (1964), and New Jersey, State v. Scanlon, 84 N. J. Super. 427, 202 A. 2d 448 (1964), have, however, held that a request is necessary for the Escobedo rationale to come into play. Accord, People v. Gunner, 33 LW 2488. The Supreme Court of Pennsylvania, in three recent cases, Commonwealth ex rel. Linde v. Maróney, 416 Pa. 331, 206 A. 2d 288 (1965); Commonwealth ex rel. Storch v. Maroney, 416 Pa. 55, 204 A. 2d 263 (1964) and Commonwealth v. Coyle, 415 Pa. 379, 203 A. 2d 782 (1964), has also taken the view that a request is necessary.”
The court prefers to follow the opinion of the New York Court of Appeals rather than adopt the ruling of the Third Circuit Court of Appeals, unless upon a review and a contrary determination has been made by the United States Supreme Court. Surely there is need for clarification of the problem herein presented. Unquestionably a final determination of this issue is of great concern to the Judges who are called upon to make initial rulings during the course of a trial. The ultimate answer may soon be found when this question will no doubt be presented to the highest court of our land for determination as to whether failure to warn an accused of his right under the Sixth Amendment to the United States Constitution is not a denial of “ assistance of counsel ”.
The remaining issue to be determined is whether or not the defendant’s condition was such that any interrogation resulting in admissions of an inculpatory nature should be excluded as a matter of law; and, did the circumstances of his condition require assistance or advice of counsel. In Townsend v. Sain (372 U. S. 293, 307) the Supreme Court said: “ If an individual’s ‘ will was overborne ’ or if his confession was not ‘ the product of a rational intellect and a free will ’ his confession is inadmissible because coerced.” Does the fact that the defendant admittedly was suffering from severe gunshot wounds with accompanying suffering and pain, per se, compel the finding that the admissions were produced by “ mental coercion ” and therefore violative of section 395 of the Code of Criminal Procedure and the due process clause of the United States Constitution?
Accepting the most favorable view of the evidence, the proof permits no construction that would lend the slightest support to the defense contention that the defendant’s condition made *757 him easy prey for mental compulsion. Such claim is not borne out by the testimony adduced at the hearing and has no basis in fact, law or logic. In the case at bar, it is quite evident no circumstances, even in the slightest degree, were comparable to the disclosures in People v. Leyra (302 N. Y. 353, 362; sub nom. Leyra v. Denno, 347 U. S. 556). The Leyra case had a well-founded claim of mental coercion, and in the opinion of the court it was stated: “ [The] trial court should have so determined as a matter of law; it is the duty of the court to reject a confession if a verdict that it was freely made would be against the weight of the evidence. (People v. Doran, 246 N. Y. 409; People v. Valletutti, 297 N. Y. 226.) ”
The transcript of the preliminary hearing of the issue of voluntariness of the confession indicates that the alleged inquiry when the defendant made his admissions on both occasions apparently took only a few minutes. That the defendant’s rights were not violated during the so-called “ Huntley ” hearing was clearly established. The defendant made no complaint of any pain and suffering; his actions and conduct were normal under the circumstances; and, to arrive at a conclusion that the defendant was in such a state of mind that his resistance to questioning was impaired to the extent that it amounted to a torture of the mind and body; that it constituted a form of mental compulsion or coercion would be unwarranted by the evidence, and no basis for such a determination would be justified by the testimony. It would require an extreme distortion of the evidence to arrive at such a conclusion. A confession or admission is excluded when it is made in violation of constitutional and statutory safeguards. (U. S. Const., 14th Amdt.; N. Y. Const., art I, § 6; Code Crim. Pro., § 395.)
In Leyra v. Denno (347 U. S. 556, 558) the court stated: ‘ ‘ The question for our decision is therefore whether the present confessions were so coerced. This question can only be answered by reviewing the circumstances surrounding the confessions.” Then again (p. 561): “ The undisputed facts in this case are irreconcilable with petitioner’s mental freedom ‘ to confess to or deny a suspected participation in a crime ’ * * *. First, an already physically and emotionally exhausted suspect’s ability to resist interrogation was broken to almost trance-like submission by use of the arts of a highly skilled psychiatrist. * * * We hold that use of confessions extracted in such a manner from a lone defendant unprotected by counsel is not consistent with due process of law as required by our Constitution.”
*758 In compliance with the directives and mandate of the Jackson v. Denno case and the procedure adopted in the Huntley case, the court conducted a pretrial, full, independent and evidentiary hearing and has, after due consideration, made the following findings of fact and conclusions of law. The People called four witnesses in support of the admissibility of the inculpatory statements made by the defendant. The defense offered one witness, the defendant Jackson, who testified in his own behalf. The court finds that the testimony of the prosecution witnesses to be trustworthy, credible and believable.
(1) The court finds that the defendant made the two alleged inculpatory statements, one at about 2:00 a.m. and the other at 2:20 a.m.
(2) The proof establishes that he was not in such pain or that the pain he suffered did not prevent his understanding questions propounded to him, and, that he fully understood what he was asked and realized the statements that he made.
(3) That there was no coercion, either physical or mental, exerted upon the defendant that caused him to make the alleged inculpatory statements.
(4) That the defendant was conscious at all times and coherent in his speech and co-operative in his conduct.
(5) That there was no medication of any kind administered to him that could or did affect or impair his ability to resist questioning and making coherent answers to his questioner or to anyone present at the time such statements were made.
(6) That the defendant was not advised of right to counsel and the privilege against self incrimination; neither did the defendant request aid of counsel or ask whether he had the right to refuse to answer.
(7) That the physical and mental condition did not, per se, or any attendant circumstances require the officer to warn the defendant of his right to the aid of counsel.
(8) That the proof offered by the defendant was not believable and was untrustworthy.
(9) The court further finds that the claims of the defendant that he was deprived of a drink of water in order to compel and force him to make the inculpatory statements are not borne out by the evidence; to the contrary the failure or refusal to give the defendant water was ordered by the doctor as a preoperative precautionary measure.
The court concludes that the statements or confessions were beyond a reasonable doubt voluntary and were made by the defendant freely and without any mental compulsion, and as to the defendant’s condition, the court is of the firm belief that the *759 evidence clearly indicates that Jackson was not prevented from resisting interrogation if he so desired and was comprehensive of what he said and had full knowledge of all the attendant circumstances during the questioning.
Accordingly, the motion to rule the admissions or confessions to be involuntary and inadmissible is denied.