William W. Serra, J.
In the action against the defendant, Joseph Augello, a petition to set aside the judgment of conviction of the defendant dated March 9, 1944, was construed by the Hon. Alfred M. Kbamee, of this court, to be in the nature of a petition for writ of error coram nobis and a hearing was ordered in accordance with the direction of the Court of Appeals in People v. Huntley (15 N Y 2d 72 [1965]). In the action against Bernard Berman, upon a petition for writ of error coram nobis to set aside the conviction of the defendant on March 9,1944, a hearing was similarly directed by the Appellate Division, Fourth Judicial Department, in accordance with proceedings consistent with the Huntley decision (People v. Berman, 23 A D 2d 532). The defendants were jointly tried and convicted in 1944 and by consent in open court have been heard together on the issues raised by the two petitions. The original convictions were for murder in the first degree committed on December 29,1943, and upon the recommendation of the jury the defendants were sentenced to life imprisonment. They have served almost 22 years of confinement for the crime, having been arrested January 14, 1944.
Upon a review of the record of the original trial of the actions, it appears that there was ample evidence to sustain the conviction independently of the three confessions of each defendant. Despite this fact the greater part of the proof was devoted to testimony concerning the facts and circumstances surrounding the taking of the confessions, involving some 22 witnesses. The trial court Justice submitted the question of voluntariness to the jury. The defendants, however, did not have a separate *552 hearing on the issue of voluntariness out of the presence of the jury as now required by Jackson v. Denno (378 U. S. 368 [1964]) and People v. Huntley (supra).
It is the contention of both defendants that the confessions were involuntary, that they were coerced or induced by long, continued, unrelenting questioning without benefit of counsel, without advice as to rights, under the physical duress of no food or water for some 15 or more hours, under continuous physical abuse with handcuffs used during all the questioning and without sleep; that in addition, their wives were unlawfully detained, were kept from them and were used as a lever to extort confessions;' that such practices were continued until their individual resistances were overcome and they finally succumbed to the point of signing statements which they normally would not have executed, and which were not freely given.
Certain facts are undisputed and can be set forth as background to the situation. The defendants were apprehended in Onondaga County by officers of the Sheriff’s department at about 2:30 p.m. on Friday, January 14,1944. They were at that time driving in an automobile owned by Mrs. Berman and operated by the defendant Berman. The defendant Augello and Mrs. Augello were in the rear of the automobile, the Bermans in the front. The men and their wives were not advised of any charges but were all taken to the city line and turned over to city police who were waiting at the 'Syracuse City line. From there they were taken to the Syracuse Police Headquarters. The defendants were interrogated together continuously until about 6:00 p.m. when they were taken to a basement cell block in the building. Interrogation up to this point was only in connection with matters other than the murder charge upon which the convictions herein were based. From this time until about 7:00 a.m. each defendant was questioned separately, about this crime and other matters, at first by the Syracuse officers and from about 3:00 a.m. by Buffalo officers led by Detective Sergeant Fitzgibbons. The procedure during these interrogations was for one man to do the questioning seated in front of the defendant with a large number of officers standing all around him. Some officers were uniformed, some were not. Most if not all of the questioning was done by Detective Sergeant Fitzgibbons after 3:00 a.m. and prior to that by either Deputy Chief John A. Kinney nr by Inspector Fred Arnold, both of the Syracuse Police Department. During all of these interrogations from 2:30 p.m. on Friday until approximately 7:00 a.m. on Saturday, the defendants were kept handcuffed. During the short periods when not being questioned after 6:00 p.m., each *553 defendant was removed to the cell block and placed in an unlighted cell of small size described by various witnesses as 5 or 6 feet wide and 8 or 10 feet long with a suspended board type cot and with limited toilet facility at one end. They were each brought up for interrogation several times during the evening. The defendant Augello in final interrogation was questioned by Detective Sergeant Pitzgibbons from 3:00 a.m. to about 5:15 or 5:30 a.m. at which time he signed a confession prepared during the interrogation by a police typist. The defendant Berman was then interrogated by Detective Sergeant Pitzgibbons and signed a confession at about 6:30 or 7:00 a.m. Saturday, January 15. The wives of both defendants were detained in the matron’s room during all of this period. Although each defendant saw his wife in the hall or through a door window on one or more occasions between interrogations the defendant Berman did not talk to his wife until after he signed the first statement about 7:00 a.m. on the 15th. The defendant Augello saw and spoke to his wife momentarily at about 7:00 p.m. and again about 8:00 p.m. on the 14th but she did not visit with him at length until he signed the statement at about 5:15 a.m. on the 15th. This was verified by the testimony of Inspector Arnold of the Syracuse Police Department and others. Augello had been married about four months at the time of apprehension and Berman for only six days. Neither defendant had any food from about 7:00 a.m. on the 14th until after the statements were signed on the 15th. They were offered neither food nor water from the time of their apprehension on the 14th until after they signed the first statements, when they were given a light breakfast. A second statement was taken later that day without any lunch from noon to 2:30 p.m. at the office of the District Attorney of Onondaga County. The defendants and their wives left about 4:30 p.m. January 15,1944, for Buffalo and arrived at Buffalo, N. Y., about 10:00 p.m. at which time the wives were released from custody and cautioned not to leave the city. The defendants were offered supper en route to Buffalo, Augello testified he was, however, still too sick to eat. The defendants were at no time prior to arraignment advised of any right to counsel, they were not advised they did not have to answer questions or that their statements might be used against them on a trial of the issue or that they could consult with any friend or relative. They were not arraigned until Monday, January 17 at 10:00 a.m. in Buffalo City Court. The police officers uniformly testified there were no threats used, no promises made, no one struck any of the defendants. A further statement was taken from each defendant *554 on Sunday afternoon from 2:00 to 4:30 p.m., January 15, at the office of the Erie County District Attorney.
Aside from these facts applying substantially to both men the claims of each man present special points and also special questions of conflict of evidence. Augello sustained a head injury with a severe concussion in 1937 as the result of a childhood fall. A posttraumatic headache condition with recurrent attacks of disabling pain resulted. Much testimony concerning this injury was developed on the trial and it was the defendant’s principal defense, supported by medical testimony, that he was mentally ill and not legally or morally accountable for his behavior on the day of the homicide. The State’s witness, Dr. Fletcher, testified that Augello had a constitutional psychopathic personality, which he defined as “ a developmental condition, a defect in the field of emotion and will, a mental deformity.” At the time of his detention on January 14, 1944, Augello had pills in his possession which were shown on this hearing to be a mixture of codeine, a narcotic pain reliever, of aspirin and of phenobarbitol, a sedative and hypnotic. This was developed by the testimony of the pharmacist who filled the prescription. Testimony was also produced on this hearing by Dr. Louis A. Trovato, an internist, that deprivation of the medicine during one of the headache periods would cause aggravation of the headache, as would tension and anxiety, deprivation of food and that vomiting would indicate the headache was severe, that a severe headache could reduce his resistance, but that whether it would reduce his ability to freely answer questions would depend on the threshold of the specific individual. The pain-relieving pills were removed from his possession at his arrival at the Syracuse Police Department. It is uncontroverted that on arrest, when Augello complained he needed his pills for his headaches, he was denied the pills but told he could have aspirin. His pills were not returned to him during the interrogation period. It is not certain when they were returned. Augello testified he had a four-day headache which began prior to the arrest and that he vomited about 8:00 p.m. Friday, and was still too sick Saturday afternoon to eat. He also stated that the pills were not given him during the four days from January 14 to 17. He testified that Detective Sergeant Fitzgibbons promised to release his wife if he signed a statement, which was denied by Officer Fitzgibbons. He further stated Sergeant Fitzgibbons promised him his medicine if he signed a statement. Mrs. Augello, now Mrs. O’Farrell, in a deposition gave testimony that she was kept in a locked room during the interrogation, that from 2:30 on January 14 to *555 5:00 a.m., January 15, slie was not allowed to make any telephone call or talk to anyone except her husband, that she cried on the occasions she saw her husband and fainted on one of the occasions, and that the police officers told her she would be released from custody when her husband gave her the information they wanted.
The defendant Berman states that he was denied any right to talk to his wife until he signed a statement, that he saw her crying during the evening, that he was threatened she would be charged with unlawful possession of a gun because the murder weapon was found in her car, although he did not believe this, that he was promised she would be released when he signed the statement. In fact she was allowed to visit him for the first time immediately after he signed the first statement at 7:00 a.m. on Saturday morning. Great emphasis has been placed by counsel on the development of this defendant’s breakdown of resistance by reason of threats against his bride of six days, as well as her continued detention.
As previously stated, upon the original trial of these two defendants, no separate determination was made by the court of the question of voluntariness of the confession. Prior to the decision in Jackson v. Denno (378 U. S. 368 [1964]), it was the law and the practice in New York State to submit to the jury the entire question of whether the confession has been “ made under * * * threats, or unless made upon the stipulation of the district attorney, that he shall not be prosecuted therefor”. (Code Crim. Pro., § 395.) The effect of this practice was, first, to deny the defendants the right to testify as to the manner of taking of the confessions unless they became witnesses, and secondly, to leave the question undecided as to what, if any effect the jury may have given to the confession even though it determined the same to have been involuntarily made. The cases of Augello and Berman have now been reheard by this court and the original trial record considered together with substantial presentation of additional testimony including that of both defendants in accordance with the directions of People v. Huntley (15 N Y 2d 72, 77 [1965]).
The sole issue considered by the court herein is the question of whether the confessions made a part of the original trial are voluntary. “ The Judge must find voluntariness beyond a reasonable doubt before the confession can be submitted to the trial jury. The burden of proof as to voluntariness is on the People.” (People v. Huntley, supra, p. 78.) It has not been within the consideration of this proceeding that there may have been ample proof outside the challenged confessions that the defend *556 ants were guilty beyond a reasonable doubt. (Lynum v. Illinois, 372 U. S. 528 [1963]; Rogers v. Richmond, 365 U. S. 534 [1961]; Payne v. Arkansas, 356 U. S. 560 [1958]; People v. Gunner, 15 N Y 2d 226, 229 [1965].)
The question of voluntariness has long been one which defies absolute definition, being dependent upon the facts in each case. In early cases in this State physical coercion was the basic test, and when the will was overcome the confession was deemed unreliable and therefore inadmissible. (People v. McMahon, 15 N. Y. 384.) This rule has been gradually modified to take into consideration more subtle approaches and to take into account psychological overreaching and emotional pressures beyond the individual threshold of resistance. The deceptive use of a police doctor was held to result in an involuntary confession (People v. Leyra, 302 N. Y. 353 [1951]). New York State began to apply the right against self incrimination rule to the question of voluntariness beginning with the reversal of People v. Spano (4 N Y 2d 256 [1958]) in the case of Spano v. New York (360 U. S. 315). Thereafter the Court of Appeals applied the rationale of the dissent by Chief Judge Desmond in subsequent cases of People v. Di Biasi (7 N Y 2d 544 [1960]); People v. Waterman (9 N Y 2d 561 [1961]; People v. Meyer (11 N Y 2d 162 [1962]). These were counsel eases affecting postarraignment confessions. These cases are particularly significant, however, in reviewing the broadening of the concept of voluntariness as affecting due process. In Escobedo v. Illinois (378 U. S. 478 [1964]) a new note was injected into the question of voluntariness when Justice Goldberg said (p. 492): “ We hold only that when the process shifts from investigatory to accusatory — when its focus is on the accused and its purpose is to elicit a confession — our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer.” While we cannot ignore this admonition as a consideration in the interpretation of the facts, neither can we extend it to the point of stating that these defendants were entitled to be warned of their rights as an absolute condition precedent to the taking of a confession after the police decided the defendants were, in their minds, to be accused of crime. This approach, which is the law of California (People v. Dorado, 62 Cal. 2d 350 [1965]), has been rejected by the New York Court of Appeals in People v. Gunner (supra, p. 233).
We may, however, consider, on the question of voluntariness, that the wives of the defendants may have been used to coerce a confession (People v. Hocking, 15 N Y 2d 973 [1965]). It *557 was therein stated (pp. 974-975): “The fact that the police refused a request by the defendant’s father to see and speak with the defendant during the period he was being questioned by the police at the station house, while not in and of itself sufficient reason or basis for excluding the defendant’s confession, may, of course, upon the hearing which we are directing, be considered, along with all the other circumstances of the interrogation, in passing upon the voluntariness of the defendant’s statements.” (See, also, Haynes v. Washington, 373 U. S. 503 [1963] to same effect.)
Serious consideration must be given, too, to delay in arraignment. The first statements were taken after 14 to 16 hours, the second completed after 26 hours, and the third after 50 hours of detention. The defendants were not arraigned until more than 67 hours from the time of their arrest. Delay in arraignment is prohibited by section 165 of the Code of Criminal Procedure. All of the officers involved testified they knew it was unlawful to hold the defendants without arraignment. Delay in arraignment alone has not been held to be grounds for a determination of involuntariness but is for consideration upon all of the facts to be weighed by the court. (People v. Vargas, 7 N Y 2d 555; People v. Lane, 10 N Y 347 [1961]; People v. Vitagliano, 15 N Y 2d 360 [1965]; People v. Jackson, 46 Misc 2d 742 [1965]; People v. Blando, 23 A D 2d 761 [1965]; Watts v. Indiana, 338 U. S. 49 [1949].) The consideration of this factor thus becomes more significant as the delay increases.
Similar holdings have been rendered by the United States Supreme Court and must be considered in their perspective of Federal-State law insofar as the Fourteenth Amendment of the Constitution of the United States applies due process to the States. In interpreting the Fifth and Sixth Amendments the Supreme Court has held the following to be factors for consideration under Federal law: undue delay in arraignment (Watts v. Indiana, 338 U. S. 49); abusive confinement in a barren cell (McNabb v. United States, 318 U. S. 332); use of large number of interrogators (Blackburn v. Alabama, 361 U. S. 199); lack of food and rest (Payne v. Arkansas, 356 U. S. 560); humiliating treatment of defendant (Malinski v. New York, 324 U. S. 401); physical condition of defendants (Reck v. Pate, 367 U. S. 433).
Upon the hearing herein, the Industrial Superintendent, the General Industrial Foreman, a retired correctional officer and a Correctional Lieutenant of Auburn State Prison gave character reputation testimony as to the defendant Augello in glowing and extravagant terms. Consideration has been given to this testimony in weighing the testimony of the defendant Augello *558 upon this hearing. It is also interesting to note that in the original confessions, when prepared by and signed before the Syracuse authorities, Augello and Berman both-said the Syracuse police treated them all right. In the confessions before the Onondaga District Attorney, when still in Syracuse police custody, they again repeated they were well treated. At Buffalo, out of the custody of the Syracuse police and in the custody of the Buffalo police, both said the Buffalo treatment was good but Augello stated “ The Syracuse Police wouldn’t turn my wife or Berman’s wife loose unless we confessed all the crimes we had charged against us.” Berman was not asked about the Syracuse police.
For clarification of the record, the court has considered the evidentiary matters reserved subject to connection on this hearing as having been sufficiently connected by the testimony and subsequent proof, and they are admitted. This applies particularly to the testimony of Dr. Travato, Mr. Infantino and Grace Militello.
Only the highlights of more than 2,000 pages of proof have been touched in this memorandum. No isolated proof of a single incident of violence or promise by a District Attorney has been shown except as discussed herein. In analyzing the entire record, however, a picture is presented of continuing lines of abuse which, like a series of melodies placed in counterpoint, eventually develop into a symphonic crescendo. Finally the build-up of pressures resulted in the capitulation and the confessions which, then being under serious compulsion are, of course, meaningless gatherings of words. It may be said that the totality of the circumstances goes beyond the allowable limits. (Fikes v. Alabama, 352 U. S. 191, 197 [1957].) As to the first two confessions, the proof of relentless interrogation in handcuffs throughout the night, against one man who was ill and a groom of six days while their wives were unlawfully detained with threats and promises involving the wives used against them presents a picture as to which this court cannot dispel a reasonable doubt. The burden has not been met by the People as required by People v. Huntley (supra).
On first examination, the third confession presents a closer question. The defendants have been relieved of the pressures inherent in the detention of their wives, they have had a night of sleep. On closer scrutiny, however, it is merely a matter of shifting emphasis. We now have the picture of men held without direct contact with the outside world for 48 hours, without the aid of counsel, without advice as to the right to counsel, to remain silent, or that their statements might be used against *559 them. I find as to these defendants, that they each had only two years of high school education, that their wills were previously broken by coercive measures, that they had gone 39 hours or more without sleep on January 14 and 15, that they had been subjected to relentless interrogation on those days, without food or water and while handcuffed, that their wives were illegally held and used to extract the prior confessions, that Augello was a sick man and denied needed medication, that they were denied substantial legal rights, including the right of arraignment at which counsel would have been offered them for about 50 hours prior to the time of signing the last statement, and that by reason of the accumulation or composite of these factors the third statement must be excluded as well as the first two. It could hardly be said that there is no reasonable doubt that their confessions at this point represented a free and voluntary act of their individual wills. To the contrary, a reasonable doubt must exist as a matter of law. It matters not that there have been changing concepts as to the proper approaches to the question. If a statement is now deemed unvoluntary, founded upon coercion and therefore meaningless, then it was no less so merely because it happened 22 years ago. If we are more sophisticated in our concepts we are no less human in our feelings. “ This court should not be ignorant as judges of what we know as men. ’’ (Watts v. Indiana, 338 U. S. 49, 52, supra.)
The judgments of conviction in both cases should be set aside.