THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CAMILO WESTON LEYRA, Appellant.

Argued January 8, 1951; decided April 12, 1951.

*Harry G. Anderson* and *Frederick W. Scholem* for appellant.
I. The alleged confessions were obtained by unlawful methods
and their admission in evidence constitutes reversible error.
(*People* v. *Lewis*, 238 N. Y. 1; *People* v. *Crossman*, 184 App.
Div. 724; *People* v. *Kurtz*, 42 Hun 335; *United States* v. *Bayer*,
331 U. S. 532; *People* v. *Reilly*, 224 N. Y. 90; *People* v. *Wolcott*,

51 Mich. 612; *Commonwealth* v. *Taylor,* 5 Cush. [Mass.] 605; *People* v. *Randazzio,* 194 N. Y. 147; *People* v. *Fernandez,* 301 N. Y. 302; *People* v. *Esposito,* 287 N. Y. 389; *People* v. *Valletutti,* 297 N. Y. 226; *People* v. *Levan,* 295 N. Y. 26; *People* v. *Williams,* 292 N. Y. 297; *People* v. *Kennedy,* 159 N. Y. 346.) II. The alleged confessions were obtained by hypnosis and their receipt in evidence constitutes reversible error. (*People* v. *Valletutti,* 297 N. Y. 226; *People* v. *Barbato,* 254 N. Y. 170; *People* v. *Weiner,* 248 N. Y. 118; *People* v. *Kennedy,* 159 N. Y. 346.)

*Miles F. McDonald, District Attorney* (*William I. Siegel* of counsel), for respondent. I. Appellant's guilt was established beyond a reasonable doubt. (*People* v. *Lewis,* 238 N. Y. 1; *People* v. *Joyce,* 233 N. Y. 61; *People* v. *Perez,* 300 N. Y. 208; *Lyons* v. *Oklahoma,* 322 U. S. 596; *People* v. *Alex,* 265 N. Y. 192; *People* v. *Doran,* 246 N. Y. 409; *People* v. *Trybus,* 219 N. Y. 18; *People* v. *Elmore,* 277 N. Y. 397; *People* v. *Deacons,* 109 N. Y. 374; *People* v. *White,* 176 N. Y. 331; *People* v. *Buffom,* 214 N. Y. 53; *People* v. *Furlong,* 187 N. Y. 198; *People* v. *Kennedy,* 159 N. Y. 346; *People* v. *Randazzio,* 194 N. Y. 147.) II. The verdict of the jury was warranted by the evidence. No errors of law were committed by the trial court. The verdict and judgment should, therefore, be sustained. (*People* v. *Becker,* 215 N. Y. 126; *People* v. *Chapman,* 224 N. Y. 463; *People* v. *Peller,* 291 N. Y. 438.)

FROESSEL, J. On the afternoon of Tuesday, January 10, 1950, Camilo Leyra, Sr., seventy-five years old, and Catherine, his wife, eighty years old, were found dead in their rear apartment on the first floor of premises 105 Quincy Street, Brooklyn. Death resulted in each case from a fractured skull, caused by several blows from a hammer. Their son, Camilo Leyra, Jr., fifty years old, is the defendant in this action. He now stands convicted of the murder of both parents, and has been sentenced to death on each of said convictions.

The verdict rests largely upon alleged confessions of the defendant. If they were properly received in evidence, followed by proper instructions from the court, the verdict would be clearly warranted, and we could not interfere with the execution of sentence for these brutal crimes. The conclusion is inescapable, however, that grave and prejudicial errors were committed

with respect to these alleged confessions, so fundamental in nature as to require a reversal and a new trial. To hold otherwise would ordain the rule that the fundamental rights of a defendant to a fair trial under our laws may be deliberately disregarded if the evidence, however improper, points to the defendant's guilt. " Such a course will simply mean in the long run the abolishing of all forms of law taught by experience to be necessary to the protection of the innocent ". (*People* v. *Marendi,* 213 N. Y. 600, 619, 620.)

It appears from the evidence in this record that defendant led a somewhat unusual life. He worked for his father as a salesman in the latter's business; at the same time he was separately engaged, on the father's premises, in a partnership with one Herrschaft who was also an employee of the father; defendant also worked as night bartender in a cabaret or night club in the Greenwich Village section of New York City. For at least a year prior to the time in question, defendant claimed he had slept but four hours a night. He had a wife and three children who lived in their home in New Jersey, and whom he visited regularly at least once a week, usually over Saturday night; at the same time, however, he maintained an apartment in Greenwich Village which he shared with his paramour.

Although suspicion was not at first directed toward defendant, it was not long before the attention of the police focused upon him. He was subjected to their routine questioning on the evening of the homicides and on the following day, Wednesday, and, while a written statement was taken from him containing no admissions, he was not detained. He denied all knowledge with respect to the crimes, and told the police of his movements on the day of their commission, which included a visit to his wife in New Jersey in the morning, and attendance at his office in the afternoon, thereby tending to establish an alibi. Inasmuch as his father had not appeared at his office that day, defendant, his partner, Herrschaft, and his cousin, Valdes, called at the father's home at about 3:30 P.M., when the homicides were discovered. Defendant appeared visibly shocked by the discovery, and later stated that he had been fearful for his parents' safety due to the deterioration of the neighborhood, and because they had had some trouble with people in the vicinity.

Because of a statement made to the police by defendant's paramour with respect to defendant's new clothing, the police inquiry continued, and defendant was taxed with discrepancies in his alibi. After accompanying detectives on Thursday morning to various places in Manhattan to check his statements, he remained in the custody of the police for all practical purposes until he was arraigned on Saturday morning, two days later. There is no evidence that the police offered him any violence during that time, but he was subjected to much questioning by detectives. Among them was Captain Meenahan, the officer in charge of the homicide squad, who questioned him intermittently from two o'clock Thursday afternoon, throughout the night, and until about nine o'clock Friday morning. In relation to later events, it may thus be noted that defendant had no sleep whatever that night.

During this questioning, defendant made a number of very damaging admissions, to the effect, contrary to his previous statements, that, although his memory was not entirely clear, he thought he must have been at his parents' home on the preceding Tuesday morning, at or about the time of the commission of the homicides. He told of arguments with his father over the preceding week end, and said, "Let me think this thing out." After numerous other admissions, defendant finally said, "I must have been there; I remember; definitely I was there. * * * I am certain I was there — Captain, I was there. * * * Captain, it was me. Who else could it be?" He then described how he met his mother at the door, giving all the details of that episode, but did not admit the homicides.

At about 9:00 A.M. he was taken by detectives to attend the funeral of his parents, and upon his return to the police station signed a consent to remain in police custody. Thereafter he was taken by two detectives to a hotel in Brooklyn where he went to a barbershop, had lunch, and was allowed to go to bed for an hour and a half, after which the detectives awakened him and returned him to the police station at about 5:00 P.M.

Defendant's principal assignments of error relate to the events which took place subsequently that evening, when he is alleged to have made several confessions. He claims (1) that these alleged confessions were obtained by unlawful methods and their admission in evidence constitutes reversible error;

(2) that the court's instructions were erroneous, and (3) that the alleged confessions were obtained by hypnosis and their receipt in evidence was prejudicial error.

Not content with the admissions already made by defendant to Captain Meenahan, the latter, at about 7:00 P.M. on that evening, introduced defendant to a physician, who is also a specialist in neurology and psychiatry, a psychologist, and one who uses the technique of psychoanalysis in his practice. This doctor, unconnected with the police department or the prosecutor's office, had been called to the police station by the District Attorney, who outlined the case to him. The doctor had also been "briefed" by Captain Meenahan, as is manifest from the questions he asked. He agreed to talk to defendant upon condition that there be no one else in the room; he knew, however, that the room was wired and that the interview would be electrically recorded by a recording machine, which was specially set up that day. The police and the District Attorney were in the basement of the police station, where they overheard the entire interview and permitted it to continue uninterruptedly.

The doctor spent an hour or an hour and a half with defendant. A transcript of the recorded interview shows that he told defendant at the outset: "I'll tell you what the purpose of my talk to you is. I want to see if I can help you." To this defendant answered: "Yes, Doctor." The doctor asked him about his sinus condition and the treatment he had had, and in the course of the interview said: "I'm your doctor." The transcript further discloses that on at least forty occasions the doctor in one way or another promised to help defendant, and on one occasion said: "I know you are in a little trouble. We do sometimes things that are not right, but in a fit of temper or anger we sometimes do things that we aren't really responsible for. I want to see whether or not you did something but which you've done in a fit of temper or anger. Do you understand me? A. Yes." Defendant told the doctor he was "very tired. I had two hours sleep. Just now they woke me up. That's since Tuesday. Well, there were questions, after questions after questions by the thousands. * * * The only thing is I'm very tired. I didn't feel as tired before I went to bed as I do now. You know (interruption)". This interruption was said to be noise, but no one knows what else defendant said here.

It happened numerous times throughout the recording. So with whispers, identified by the doctor as sounds made by defendant when he did not speak audibly. In these respects the statement is definitely incomplete. Defendant then stated that his sinus was "bothering" him "something terrible", and that for the past two years he had averaged over a hundred hours of work a week without vacation. After more conversation, the following took place:

"Q. I want you to recollect and tell me everything. I am going to make you remember and recollect back and bring back thoughts — thoughts which you think you might have forgotten. I can make you recollect them. It's entirely to your benefit to recollect them because, you see, you're a nervous boy. You got irritable and you might have got in a fit of temper. Tell me, I am here to help you. A. I wish you could, Doctor.

"Q. I am going to put my hand on your forehead and as I put my hand on your forehead, you are going to bring back all these thoughts that are coming to your mind. I am going to keep my hand on your forehead and I am going to ask you questions and now you will be able to tell me."

This technique — of promising help, such as "We'll help", "Everybody will help you", "We're with you one hundred percent", "We'll play ball with you"; placing his hands on defendant's head; "making" him recollect; minimizing the homicides by suggesting they were done in a fit of temper, saying, "Morally, you are not to be condemned, right? A. Right"; commanding defendant to look at him, to open and close his eyes; suggestions to defendant as to what he should say — runs all through the transcript of the recording.

The doctor was making some progress in breaking down defendant and getting some admissions, knowing that defendant was under "tension", "pale", his mouth was "dry", and despite defendant's frequent "I can't remember", "Doc, I'm trying so hard", "Doctor, I'm exhausted, so please be patient." The doctor kept at him: "See, I can make you talk very truly. I can give you an injection now." Near the end of the interview the following occurred:

"Q. You have a much better chance to play ball (Noise) than if you say you don't remember. If you tell me that you were in a fit of anger, that you were angry, that you just swung the

hammer, but if you tell me that you don't remember, then you will be working against yourself. Where will it get you? A. At that point there, I was so mad. I was like white hot metal. I was so mad. I was never mad at anyone in my life * * * (Noise) * * *

" Q. Do you feel better? * * * (Noise) * * * Do you want coffee? A. I drank coffee all night long * * * (Noise) * * * " (asterisks *sic*).

What happened during these " Noise " periods, we do not know; why the doctor suddenly asked defendant after an interruption, " Do you feel better? ", followed by another interruption, is unexplained. In any event, the doctor continued with this significant question: " Q. These people are going to throw the book at you unless you can show that in a fit of temper you got so angry that you did it. Otherwise they toos [toss] premeditation in and it's premeditation. See? " The import of this language should not be overlooked.

After some more coffee, defendant asked to speak to Captain Meenahan, whereupon he made a full and detailed confession to both homicides, in the course of which he stated he lost his temper and was overcome by a fit of anger and rage. Following his confession to Captain Meenahan, he told his partner, Herrschaft, who had been directed by a detective to be present, that he " did it." Thereafter and during the same evening, defendant again confessed these crimes to two assistant district attorneys, who took the written statement from him offered in evidence. He was fingerprinted that night and arraigned the next morning.

The chief issue raised by defendant at the trial is concerned with the claim that defendant was hypnotized by the doctor; that all of the confessions of Friday evening were made under that hypnotic influence; and that they were involuntary and untrue. He denied that he killed his parents, and asserted that he did not know what happened within a few minutes of the time he started talking to the doctor and the following Sunday morning, when he claims to have recovered volition and memory while in jail. He further stated that the doctor had made various gestures, first with his hands and then with some object, after which he recalled nothing. After defendant testified, followed by two psychiatrists who were called on his behalf,

one of whom stated that the doctor's actions could have been nothing but hypnotism, the doctor was called in rebuttal, asserting unequivocally that he had not hypnotized this defendant.

Since the issue of hypnotism was one of fact concerned largely with the credibility of defendant as against that of the doctor, and that issue was quite fully and impartially presented to the jury, there is no reason why we should now interfere with that finding (*People* v. *Peller,* 291 N. Y. 438,.446). Because the jury decided adversely to defendant on this issue, however, it does not necessarily follow that the confessions obtained Friday evening were voluntary within the meaning of section 395 of the Code of Criminal Procedure or that there was no violation of the requirements of due process; and because defendant denied having made these confessions, he is not precluded from contending that in the event it be determined that he did make them, they were in violation of constitutional and statutory safeguards. (U. S. Const., 14th Amendt.; N. Y. Const., art. I, § 6; Code Crim. Pro., § 395; *People* v. *Joyce,* 233 N. Y. 61, 71; *Lee* v. *Mississippi,* 332 U. S. 742, 744–745; *Ashcraft* v. *Tennessee,* 322 U. S. 143, 151–154; *White* v. *Texas,* 310 U. S. 530, 532.)

We are thus squarely confronted with the question as to whether or not the admissions in defendant's statement to the doctor were properly received and submitted to the jury, as evidence from which they might determine his guilt. We think not, and, under the circumstances here disclosed, the trial court should have so determined as a matter of law; it is the duty of the court to reject a confession if a verdict that it was freely made would be against the weight of the evidence. (*People* v. *Doran,* 246 N. Y. 409; *People* v. *Valletutti,* 297 N. Y. 226.) Bearing in mind the undisputed setting in which this interview was arranged and recorded, while defendant was in custody of the police; defendant's physical and mental condition at the time, already alluded to; the psychiatrist, calling himself defendant's doctor, playing upon the latter's natural fears and hopes, pressing his hands upon defendant's head with accompanying commands, and suggesting details to an unwilling mind by persistent and unceasing questioning; informing defendant that he was not morally responsible; making deceptive offers of friendship and numerous promises, express and implied; giving assurances in a pseudo-confidential atmosphere of

physician and patient; and all the attendant circumstances taken together — this interview was a subtle intrusion upon the rights of defendant and was tantamount to a form of mental coercion, which, despite the good faith of the prosecution, we may not countenance here. No such intrusion may be sanctioned in a system of law which is based upon the presumption of innocence, surrounded by the constitutional safeguards afforded to every individual. The doctor here did not tell defendant that he had been called into the case by the District Attorney; that the latter and the police were listening to their conversation; that defendant could have his own doctor or lawyer or anyone else present; he conspicuously omitted to tell defendant that he was under no duty to speak or that anything he might say could be used against him (see *People* v. *Fernandez,* 301 N. Y. 302, 333; *People* v. *Esposito,* 287 N. Y. 389, 398).

We are, of course, not unmindful of the fact that some of these circumstances, standing alone, such as defendant's being in custody of the police (*Murphy* v. *People,* 63 N. Y. 590; *People* v. *Perez,* 300 N. Y. 208), or mere failure to warn defendant that he was under no obligation to speak or that anything he might say could be used against him (*People* v. *Randazzio,* 194 N. Y. 147), would not constitute ground for excluding his confession. But here we have much more. Moreover, while deception alone, or a mere violation of confidence by a doctor in the sense that he has voluntarily disclosed to the police a confidential communication received in the usual practice of his profession, may not render a confession invalid (see *People* v. *Wentz,* 37 N. Y. 303; *People* v. *Buffom,* 214 N. Y. 53, 56, 57), this court is unwilling to assent to the doctrine that representatives of the State may thus employ a relationship they established between the doctor and this defendant, which is of a character that our public policy holds privileged (Civ. Prac. Act, § 352), in order to obtain a confession out of defendant's own mouth without warning and under the circumstances here disclosed (*People* v. *Fernandez, supra; People* v. *Esposito, supra; People* v. *Furlong,* 187 N. Y. 198, 212). If a physician may be thus used, then why not a lawyer or a clergyman? The essential fairness which is supposed to form the warp and woof of our fabric of justice would certainly be wanting if practices such as these were to be approved (see *People* v. *Levan,* 295 N. Y. 26).

We have held that an involuntary confession is by its very nature evidence of nothing (*People* v. *Valletutti, supra,* p. 231). Moreover, our Federal Constitution (14th Amendt.) is a bar to the conviction of any individual in our courts of justice by means of a coerced confession (*Ashcraft* v. *Tennessee, supra*). We have a like provision in section 6 of article I of our State Constitution. A denial of due process has been defined as the failure to "observe that fundamental fairness essential to the very concept of justice. * * * Such unfairness exists when a coerced confession is used as a means of obtaining a verdict of guilt." (*Lisenba* v. *California,* 314 U. S. 219, 236–237.) Not only is the use of a coerced confession in obtaining a conviction a violation of due process, but, if such confession is admitted in evidence, that is sufficient to void the conviction regardless of other evidence which might nevertheless demonstrate guilt (*Malinski* v. *New York,* 324 U. S. 401, see, Note, 93 L. Ed. 115; *Watts* v. *Indiana,* 338 U. S. 49; *Turner* v. *Pennsylvania,* 338 U. S. 62; *Harris* v. *South Carolina,* 338 U. S. 68; *Haley* v. *Ohio,* 332 U. S. 596; *Ashcraft* v. *Tennessee, supra; Chambers* v. *Florida,* 309 U. S. 227).

We recognize that due process is not lacking where upon facts *permitting different conclusions* it is left for the jury, under a proper submission, to say whether or not there was coercion (*Malinski* v. *New York, supra; Lisenba* v. *California, supra; Lyons* v. *Oklahoma,* 322 U. S. 596), but here the method employed is not controverted and the statement itself is beyond dispute, for it is recorded. The transcript of the recording clearly discloses that the interview took place in an atmosphere of the utmost pressure, and in a manner and with a skill possible only to an experienced psychiatrist, unfamiliar with an accused's fundamental rights. As the prosecutor said of this psychiatrist in his summation: "with his superior mental powers, his studies of psychology, he was able to accomplish what a browbeating policeman might not have been able to obtain." This was an eloquent tribute to the efficacy of mental coercion over physical.

Torture of the mind is just as contrary to inherent fairness and basic justice as torture of the body. A confession by which a person forfeits his life must be grounded on reasoned and voluntary choice. We would have to close our minds to the

plain import of what occurred to deny that here was a deliberate attempt to extract a confession through the ceaseless pressure of a skillful psychiatrist by his peculiar technique, claiming to be defendant's doctor, promising to help him, giving assurances and at the same time conducting an unrelenting interrogation of the exhausted accused. Aside from constitutional objections, we have not yet reached the stage where medical science, represented by an accord among its experts, establishes the trustworthiness of a confession induced by the means here adopted (see 3 Wigmore on Evidence [3d ed.], § 841a; *People* v. *Forte,* 279 N. Y. 204, 206). Due process of law guaranteed by our State and Federal Constitutions commands that no such practice as revealed by this record shall send an accused to his doom, regardless of the brutality of the crimes with which he is charged.

While it is true that the statement in question was admitted as part of the People's case by way of rebuttal on the issue of hypnotism, yet, for the reasons hereinbefore assigned, the admissions contained therein should not have been received and permitted to go to the jury as evidence from which they might determine defendant's guilt. Although defendant vacillated with respect to his objections to this statement to the doctor, his counsel did attack it on the broad ground that defendant's will was wholly subservient by reason of hypnotism. Although the attack on that ground was rejected by the jury, this failure did not militate against his right to claim that his confession was nevertheless involuntary, particularly in view of the fact that after the court's charge his counsel excepted " to the whole charge of the Court on the question of a valid confession ". In any event, in a capital case we have the power to order a new trial in the interests of justice, whether or not an exception shall have been properly taken in the court below (Code Crim. Pro., § 528).

Whether the coercion which we find implicit in defendant's statement to the doctor extended over and into the later confessions to Meenahan, Herrschaft and the assistant district attorneys remains a question of fact for determination by the jury, and this question was never properly submitted to them. These confessions should have been separately considered in the light of the coercion existing at the time of defendant's state-

ment to the psychiatrist, and only if the jury were satisfied beyond a reasonable doubt that such coercion had ceased to influence defendant could they consider the later confessions. Only thus would due process of law be accorded defendant (*Lyons* v. *Oklahoma, supra*).

Another alleged infirmity in defendant's statement to the doctor is urged upon us. It is said that this statement contained promises of leniency which might be attributed, under the circumstances, to the District Attorney (Code Crim. Pro., § 395; *People* v. *Kurtz,* 42 Hun 335; *People* v. *Reilly,* 224 N. Y. 90). The court at first instructed the jury that "There is no claim here that the District Attorney induced this defendant to make a confession upon the promise that he will not be prosecuted therefor." Defendant's counsel duly excepted, and requested an appropriate charge from the court, which might eliminate premeditated murder. After some colloquy the court agreed, withdrew its original instructions in this respect, and then charged the jury in effect that they had to find a promise of complete immunity by the doctor or none at all, and only if the jury found that the former induced the confession might they acquit. While this may have been inadvertent on the part of the trial court, this instruction, to say the least, was misleading and did not cure the original instruction excepted to by defendant and which the court agreed to correct, and may well have been detrimental to defendant, particularly in the light of the doctor's statement to him that "unless you can show that in a fit of temper you got so angry that you did it * * * it's premeditation. See?" *People* v. *Mleczko,* 298 N. Y. 153, 162; Code Crim. Pro., § 528.) Moreover, here again the jury should have been instructed to consider separately the later confessions, in the light of any promise that may have been made during defendant's statement to the doctor (*Lyons* v. *Oklahoma, supra*).

While portions of the closing statements of the prosecutor relating to defendant's criminal record, and statements of the doctor concerning defendant's guilt and that he was lying, of which the learned court below took cognizance, were highly improper, they and other errors assigned require no further comment in view of the conclusion we have reached. However shocking the crimes of which defendant was convicted, his life

may not be forfeited in the light of the foregoing prejudicial errors, which deprived him of his substantial rights, accorded under our laws (*People* v. *Moran*, 246 N. Y. 100, 106; *People* v. *Levan, supra; People* v. *Mleczko, supra; People* v. *Samuels*, 302 N. Y. 163, 173).

The judgments of conviction should be reversed and a new trial ordered.

LOUGHRAN, Ch. J., LEWIS, CONWAY, DESMOND, DYE and FULD, JJ., concur.

Judgments of conviction reversed, etc.