Roy E. KINDER, Petitioner,

v.

Otto C. BOLES, Warden of the West Virginia State Penitentiary, Respondent.

Civ. A. No. 1516-W.

United States District Court
N. D. West Virginia.

April 21, 1966.

Richard H. Talbott, Jr., Elkins, W. Va., for petitioner.

C. Donald Robertson, Atty. Gen., Leo Catsonis, Asst. Atty. Gen., Charleston, W. Va., for respondent.

MAXWELL, Chief Judge.

This is a habeas corpus proceeding, brought by Roy E. Kinder, an inmate of the West Virginia State Penitentiary. Kinder is serving a life sentence for two acts of first degree murder, imposed on January 19, 1960, by the Intermediate Court of Kanawha County, West Virginia. Several months earlier, a Kanawha County jury had found Kinder guilty of these charges and had recommended mercy.

Kinder is a man with a sixth grade education, who was unemployed at the time of the killings. His earlier employment had been as a maintenance man. During trial, he was described by medical witnesses as "mildly retarded" and as a "schizoid personality with the added complications of intellectual deficiency."

The transcript of the state trial also shows that the jury was presented with the following testimony. On the evening of March 1, 1959, Dave Ellis and Mrs. Elma Dodd, for whose subsequent murders that evening Kinder was found guilty, Kinder's wife, Charma (who was Mrs. Dodd's sister), along with two other men, paid several visits to a local tavern, then returned to Mrs. Dodd's house trailer. There, a fight ensued between Kinder, who had appeared on the scene, and Ellis, whom Kinder had caught acting improperly with his wife, Charma. Kinder was badly beaten around the face and forced to leave.

Approximately three hours later, Kinder reappeared with his shotgun, fired twice into Mrs. Dodd, who had tried to stop him at the trailer door, then, stepping into the trailer, shot Ellis. After having been told that his wife was no longer there, Kinder left, not noticing that she was hiding nearby.

State troopers were thereafter called to the scene, and the testimony of at least one of them indicated not only that

Kinder's deserted auto was later found close to the trailer, but that three fired shells, found in and around the trailer, had been fired from Kinder's shotgun.

Kinder, in the meantime, still bloodied and weak from his earlier scuffle with Ellis, made his way by foot over five or six miles of rough countryside to the home of a friend. From there, on March 2, 1959, the sheriff and state police were called. The officer who actually arrested Kinder and took him to the state police barracks for interrogation testified before the jury that Kinder's face, at this time, was blood covered.

Kinder was detained at the state police barracks for approximately two and one-half hours, during which time a signed confession was obtained.[1] Afterwards,

1. My name is Roy Edward Kinder, I'm 45 years old and live at Ashford, West Virginia, Boone County. I can read and write since I finished the 6th grade in school. At the present time I'm unemployed, I have been out of work since September of 1958. Prior to being laid off from work I worked at the Owens-Illinois Glass Plant at Charleston, West Virginia.

I have been told that the following statement can and will be used against me in a criminal court of law, never-the-less I do make the following statement to Trooper R. L. Presson at the State Police Detachment office on my own free will, I have not been mistreated, nor made any promises *my (sic)* this officer, but I do state the following as to what took place at Hernshaw, West Virginia on the early morning of March 2, 1959.

On Sunday evening at approximately 8:00 P.M. I drove down to Hernshaw, West Virginia I was driving the 1947 Plymouth Club Coupe, I had my son Siegel Marshall Kinder, age 13 with me at the time. When I arrived at Hernshaw it was dark at the time and I parked my car above the service station, with the front part of my car facing the mountain, I parked in this place to check on my wife, I told my son Siegel what I had in mind when I parked the car. I had been waiting for my wife to come into the house trailer that was parked behind the service station, because she had been staying with her sister Elma Dodd, in the trailer for the past two months. At around 10:30 P.M. I got out of the Plymouth and climbed into the blue Chevrolet that was parked near the trailer, I had been in the Chevrolet approximately ½ hour when I saw this blue Chevrolet come in and park behind the house trailer, I saw my wife hugged up with a man, also I saw them enter the house trailer together, my son Siegel Kinder, saw all that happened after the car pulled in behind the trailer. When I saw my wife Charma Kinder go into the house trailer, I got out of the parked car where I had been sitting watching for my wife to come in, and I walked over to the house trailer, stepped upon the step and I reached in the trailer and got my wife by the coat collar I told her to come on and go home with me, when she lunged from me back toward the rear of the trailer, at this time I stepped up into the trailer, when I got inside the trailer this was when this fellow came up to me and said, "That he would fix me." at which time he went out of the trailer, I didn't know what he had in mind at the time so I still stayed inside the trailer trying to get my wife out of the trailer. When this man that had been with my wife came back into the trailer he was carrying a pair of shears with him, along with a couple coke bottles, when he came back into the trailer, when the fellow struck at me with the shears, he hit me in the head and as I knocked them from his hand, we both went down on the couch, while in the fight in the trailer, the two women, Elma Dodd, and my wife Charma Kinder, was over top of me hitting me. During this fight Elma Dodd, struck me with a frying pan, at which time I grabbed the file, that was laying on the heater, and struck Elma, on the head, after we had fought for some time, I told the man that I got into the fight with, that I had enough, at which time he let me up off the floor and I left the trailer. After leaving the trailer, I went outside where my son Siegel was waiting for me, we got into my car that was parked on the upper side of the trailer, and I drove straight home, to Ashford, W. Va. It was around 12:30 A.M. March 2, 1959 when I arrived at my house.

When I got home my son washed up my face and I put some salve on the cuts and then I went to bed, I was at my house approximately two hours, I fell asleep for a short time while in bed and I woke up I could see a little better I got up and got dressed and got the shotgun that was beside the bed, and left the house and got into my car and started to drive back over to Hernshaw in Kanawha County, I would judge that it was

he was taken to a nearby hospital by the troopers and given medical attention.

In addition to other exhibits, and to the lengthy testimony, above summarized, the Petitioner's confession was also presented to the jury at the state trial. During the trial proceedings, defense counsel never specifically questioned its voluntariness. But the record discloses that during a hearing held by the trial judge, out of the presence of the jury, the prime purpose of which was to determine whether a certain photograph of the defendant should be admitted in evidence, the trial judge noted that he would also allow the introduction of the confession.

The trial proceedings related to the introduction of the confession, as recorded on pages 160–4 of the State Trial Transcript, read as follows:

MR. PETTRY (for the defense):

We would like to see the pictures at this time, your Honor.

MR. WALKER (prosecuting attorney):

We object.

around 2:00 A.M. when I left my house going back over to Hernshaw.

When I arrived at Hernshaw, I parked my car above the trailer, got and walked down to the house trailer, I was carrying the shotgun with me at the time. When I approached the trailer I heard the women inside the trailer talking. They were making remarks about the fight and to the facts that I got a good whipping. When I heard this, it was at this time that I called to the women, asking them where them bad men were at now.

When they heard me say this, I saw Elma, open the door, and she told me that she had a .38 inside, and for me to get away from the trailer and leave her alone. When she opened the door I was standing in front of the door, this was when I shot her the first time, when the first shot struck her, it didn't knock her down, I reloaded the shotgun, and fired the second shot into Elma Dodd, when she went to the floor I stepped into the trailer and called to the man that was coming out of the back bedroom, I called to him asking him where that man was that had beat me up, he replied: "That he didn't know, Dave", he called me Dave, at this time I saw the man lying on the couch, who I recognized

Thereupon, out of the hearing of the jury, the following transpired:

THE COURT:

This raises the question again of the picture taken of the defendant at the time the statement was taken. They raised that question yesterday. What is the position of the State on that?

MR. WALKER:

The position of the State is that, in effect, is a part of their case, and at the proper time when they ask for the picture, or its admission in evidence, the State will object, because it is too far removed from the time of the crime, the picture being taken at 10:30 or 11 o'clock at night.

THE COURT:

Unless there was some intervening factor which made the condition different than what it was at the time of the crime.

MR. WALKER:

There is testimony in this case he walked four or five miles through very

as the man that had beat me up. This man sorta rolled over on the couch, and cupped his hands above his eyes, he was acting as if he was asleep, while he was laying on the couch, I shot him one time with the shotgun that I had in my hands, I stood in the trailer and asked the man that had come out of the bedroom, where my wife, Charma, as at, when he kept coming toward me, I leveled the gun at him and backed up. When he told me that Charma, was down at Marmet, I told him that all that I wanted was the truth, at this time I backed out of the trailer and left.

I walked back up the highway, a short distance, where I took into the woods, I started to go back to my car but I changed my mind, I wanted to see my children before I was taken by the law. I walked through the woods, approximately 5–6 miles before I got to the home of J. C. Javins, home in Dog Hollow. I got to this house just a short time before dark, where I got something to eat, and had J. C. Javins, go a call the Sheriff's Office at Madison.

I was waiting for the officers when they arrived at Javins house at 9:50 P.M. March 2, 1959.

I have read the above statement and its correct and true to the best of my

rugged territory, Corporal Whitman's testimony.

MR. PETTRY:

He was over a day doing it.

THE COURT:

They have raised the question of insanity. Normally you can show pictures of the defendant taken at this time, as long as it's shown he was like that at the time—in other words, that he hadn't gotten any other injuries. Is he going to take the stand?

MR. PETTRY:

Yes, sir.

THE COURT:

What will be his testimony in respect to that, Hayes?

MR. PETTRY:

That he had no previous injuries.

MR. WALKER:

I don't think that has anything to do with the case at this time, the Trooper testified he appeared to be normal; just a picture of a man with blood on his face shouldn't affect the evidence.

MR. SPROUSE (for the defense):

*At this time, if the Court rules one way, the jury will have the determination of whether or not this statement was made voluntarily, and his condition at the time is in issue; it will have to be decided before you can admit that in evidence. Certainly, if a man was beaten up so badly he couldn't think, would go to whether or not he could give a voluntary statement; and this photograph should be direct testimony on his condition.* (Emphasis added.)

THE COURT:

I believe I will let them put the picture in at this stage.

MR. WALKER:

There is a doctor that treated him just a short time afterwards. The picture is just a bloody picture, you can have a small cut, and have blood all over your face.

THE COURT:

Can you have the doctor here?

MR. PETTRY:

He is not available, he is not in the state. It was some intern they had up there, we have the hospital reports in, they are summonsed.

THE COURT:

I believe if a statement was taken, if that is the picture taken that showed what he looked like at the time the statement was taken, they ought to be allowed to put that picture in, Charlie.

MR. WALKER:

But I don't think that picture is sufficient to affect the legal admissibility of the evidence.

THE COURT:

*I will let the picture go in, and the statement.* (Emphasis added.)

\* \* \*

Thereupon the trial of the case resumed before the jury \* \* \*.

In other words, two facts are apparent: (1) defense counsel Sprouse indicated that the voluntariness of the confession had not been stipulated, if in fact such could properly be done, and that the jury, in some manner, and at least to a limited degree, was to consider the voluntariness of the confession; and (2) the trial judge permitted the confession to be introduced but, as the trial record later reflects, without jury instructions on this matter.

In 1964 Kinder unsuccessfully petitioned the West Virginia Supreme Court of Appeals for a writ of state habeas corpus, primarily alleging a deprivation of his Fourteenth Amendment rights, under Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Another of his primary allegations was that he had been refused medical care by the state authorities, until after he had signed the above mentioned confession.

These two arguments are specifically urged before this Court by way of federal habeas corpus relief. From a read-

knowledge as to what took place at Hernshaw, West Virginia on the early morning hours of March 2, 1959 when

I shot Elma Dodd, and a man that I now know as being Dave Ellis.

(Trial transcript, pages 166–172.)

ing of the state trial transcript, however, it is apparent that a third question is also involved. This issue is whether the manner by which Kinder's confession was submitted to the jury deprived Kinder of a reliable, judicial determination of its voluntariness, now necessitated by Jackson v. Denno, 378 U.S. 368, 376–377, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). This third issue Kinder has not articulated.

Before looking at the merits of this case more closely, it should be noted that Charles F. Paul, District Judge, now deceased, originally issued an order to show cause in this case, and that the Respondent answered. After the death of Judge Paul, the case was ordered transferred from the Wheeling, West Virginia, Civil Docket to the Civil Docket in Elkins, West Virginia. Counsel for the Petitioner was thereafter appointed, and a plenary hearing was held before this Court on October 12, 1965.

In addition to the testimony offered at this plenary hearing, this Court has given consideration to the reports, the pleadings and the orders that are a part of the records. As a result, it has arrived at the following determinations.

Petitioner's first contention, raising Escobedo ramifications, is that he was not afforded the assistance of counsel after having been placed in police custody. More specifically, he alleges that he was not effectively advised of his "absolute constitutional right against self-incrimination," and that he was not advised of his "absolute constitutional right to have the assistance of counsel before he made the said statement."

The United States Supreme Court, however, has recently heard arguments on several cases dealing with the scope, applicability and retroactivity of the Escobedo rule. California v. Stewart (No. 584) (62 Cal.2d 571, 43 Cal.Rptr. 201, 400 P.2d 97, 86 S.Ct. 882, argued March 2, 1966; Miranda v. Arizona (No. 759) (98 Ariz. 18, 401 P.2d 721, 86 S.Ct. 885, argued February 28 and March 1, 1966; Vignera v. New York (No. 760) (15 N.Y.2d 970, 259 N.Y.S.2d 857, 207 N.E. 2d 527), 86 S.Ct. 885, argued March 1, 1966; Westover v. United States (No. 761) (342 F.2d 684, 9th Cir. 1965), 86 S.Ct. 885, argued March 1, 1966; and Johnson v. New Jersey (No. 762) (43 N. J. 572, 206 A.2d 737), 86 S.Ct. 886, argued March 1–2, 1966. (Several cases are also pending in the Fourth Circuit Court of Appeals. Palmer v. Peyton [No. 9609], 359 F.2d 199; U. S. v. Slaughter [No. 9800]; Faulkner v. U. S. [No. 10,-007]; Morris v. South Carolina [No. 10,011]; Williams v. South Carolina [No. 10,023] [now disposed of on other grounds in 356 F.2d 432]; Timmons v. Peyton [No. 10,042]; Stevens v. Warden [No. 10,098]; Warden v. Ledbetter [No. 10,154].) Since decisions on these cases are expected shortly, this Court will postpone ruling on the Escobedo problems which Kinder has raised and will reconsider those matters at a later date, if necessary.

Before passing to the remaining two issues, however, it would be advantageous, to both parties herein, in case this question must be considered at a later date, to note the peculiar Escobedo questions that have been raised.

There are two. Since Kinder's arrest and trial occurred in 1959, five years prior to the United States Supreme Court's Escobedo holding, the first problem is whether or not Escobedo should be applied retroactively. There is authority that it should not. Cf. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). This question probably will be clarified, once and for all, by the Supreme Court's imminent opinion in Johnson v. New Jersey, supra (No. 762).

Secondly, Kinder does not contend, or even suggest, that he asked for and was refused an opportunity to contact counsel during the period in which the state police interrogated him and obtained his confession. Kinder's sole allegation in this regard, as stated in his petition, seems to be that the interrogating officers should have warned him of his right to have the assistance of counsel before requiring him to answer any questions that might incriminate him.

Whether *Escobedo* controls this alleged set of facts probably will be determined by the Supreme Court's expected ruling in California v. Stewart, supra (No. 584).

It bears repeating that for reasons above recited this Court has not yet ruled upon the factual allegations regarding this issue. Whether the interrogating officers warned Kinder of his right to remain silent, therefore, is a matter for future action by this Court.

Before concluding its remarks on the *Escobedo* question, however, the Court also wishes to note that this issue generally raises a factual question, and that Kinder, as far as a resolution of this specific issue is concerned, has not followed the procedure outlined by this Court in Miller v. Boles, 248 F.Supp. 49 (N.D.W.Va.1965), applicable to state prisoners raising factual disputes in their petitions for federal habeas corpus relief.

But Kinder's petition for federal habeas corpus was filed prior to *Miller*. Hence, *Miller* will not affect the disposition of this case.

Yet the same contention, raised only by itself, and if now presented to this Court for the first time, would have to be dismissed because of the reasons set out in *Miller*.

Petitioner's second contention is that he was denied medical attention until after he had signed the confession. Since this issue is factual in nature, the same *Miller* implications are involved as were discussed with regards to the first contention.

This allegation, of course, does not of itself present grounds for federal habeas corpus relief. Neither was any evidence adduced, nor strongly suggested, at the plenary hearing that this alleged denial was used as a means by which to coerce a confession out of Kinder. Even the petitioner failed to suggest coercion. As a matter of fact, Kinder himself admitted that the state troopers had offered him aspirin, to alleviate any existing discomforts then resulting from his fight with Ellis, but that he had re-fused their assistance. State Trooper Presson, moreover, testified that Kinder, although in need of medical attention, did not appear to be in desperate straights, and did not appear to have lost control of his faculties. Hence, there is testimony in the records of the plenary hearing that Kinder was in no urgent need for medical care. This testimony Kinder did not refute.

As has been stated previously, however, there is a third question arising from the allegations and testimony presented under Kinder's petition. That question is whether the manner by which Kinder's confession was submitted to the jury, as above narrated, was violative of Constitutional principles. This inquiry should be answered in the affirmative. Hence, Kinder is entitled to federal habeas corpus relief, despite this Court's present ruling on his two contentions.

Until recently, there were at least three methods by which confessions were offered in evidence at state trials. For an excellent discussion of these methods see Jackson v. Denno, supra at 378 U.S. 377–379, 84 S.Ct. 1774.

Under one procedure, commonly denominated the *New York* rule, the trial judge makes a preliminary ruling concerning confessions offered by the prosecution. These confessions are then excluded if under no circumstances can the confession be deemed voluntary. See, e. g., People v. Weiner, 248 N.Y. 118, 161 N.E. 441 (1928); People v. Leyra, 302 N.Y. 353, 98 N.E.2d 553 (1951). But if there is any question concerning the voluntariness, be it to facts, or to inferences to be drawn from undisputed facts, then the confession has to be received, and it is up to the jury, subject to proper instructions, to determine its voluntary character and truthfulness. People v. Doran, 246 N.Y. 409, 416–418, 159 N.E. 379, 381–382 (1927); People v. Leyra, supra 302 N.Y. 353, 98 N.E.2d 553.

Under a second method, known as the *orthodox*, or *Wigmore*, rule, the trial judge hears all the evidence and then rules on voluntariness for purposes of ad-

mitting the confession. Thereafter, the jury considers voluntariness as affecting the weight or credibility of the confession. See, e. g., State v. Vance, 146 W. Va. 925, 934, 124 S.E.2d 252, 257 (1962); State v. Bruner, 143 W.Va. 755, 768–770, 105 S.E.2d 140, 147–148 (1958); State v. Brady, 104 W.Va. 523, 529–530, 140 S.E. 546, 549 (1927).

The third method is known as the *Massachusetts,* or *humane,* rule. Here, the jury determines voluntariness, but only after the trial judge has independently decided the issue against the accused. See, e. g., Parker v. State, 225 Md. 288, 291, 170 A.2d 210, 211 (1961); Commonwealth v. Sheppard, 313 Mass. 590, 603–604, 48 N.E.2d 630, 639 (1943). This rule has also been adopted by the Fourth Circuit, to be used in federal court prosecutions. United States v. Inman, 352 F.2d 954 (4th Cir. 1965).

Until the United States Supreme Court's ruling in Jackson v. Denno, supra 378 U.S. 368, 84 S.Ct. 1774, all three procedures were commonly accepted. In *Jackson,* however, the *New York* rule was struck down as violative of the Due Process Clause of the Fourteenth Amendment.

The crux of the *Jackson* holding seems to have rested on three propositions. First, the Court observed that a defendant is Constitutionally entitled, at some stage of the trial proceedings, to a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession. Id. at 376–377, 84 S.Ct. 1774, citing Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

Secondly, the *Jackson* court also observed that it is impossible to tell, under the New York procedure, whether the jury has found the confession voluntary and relied upon it, or involuntary and supposedly ignored it. Therefore, the Court's acceptance of either alternative would have seriously undermined the ac-cused's Constitutional right to a fair hearing and a reliable determination on voluntariness. Jackson v. Denno, supra at 378 U.S. 377–391, 84 S.Ct. 1774.

Thirdly, the Court observed that under the New York rule there is always a danger that the jury will believe the confession voluntary, because, in cases such as Kinder's, there is an abundance of evidence to lead the jury to believe that the accused has committed the crime charged. Id. at 383, 84 S.Ct. 1774. In these types of cases, it is natural for a jury to prejudge the voluntariness of a confession. In other words, an element of truthfulness is injected into the proceedings, in contravention of Rogers v. Richmond, supra 365 U.S. 534, 81 S.Ct. 735.

Under the present law, therefore, as it has been noted both in *Jackson's* first proposition, as well as in other authority, Kinder was entitled to a fair hearing and a reliable determination on the issue of the voluntary nature of his confession. *Ibid.*

There is no supportable conclusion in Kinder's case that the trial judge did not attempt to afford Kinder the required fair hearing. The present difficulty arises because it is not clear whether the trial judge attempted to follow the Massachusetts rule, the New York rule, or the orthodox rule. It is possible to argue that the judge in Kinder's state trial tried to adhere to any one of the three. For the manner in which the confession was admitted, see the above quoted excerpt from the State Trial Transcript.

This Court believes that the trial judge attempted to follow the Massachusetts rule, the rule adopted by the Fourth Circuit in United States v. Inman, supra, 352 F.2d 954.

In the first place, the orthodox rule, even though it happens to be the rule commonly followed in West Virginia, certainly is not absolutely binding on the state courts.

In the second place, it is especially noted that defense counsel Sprouse's above quoted objections, recorded on page 163

of the State Trial Transcript, read as follows:

> At this time, if the Court rules one way, the jury will have the determination of whether or not this statement was made voluntarily, and his condition at the time is in issue; it will have to be decided before you can admit that in evidence. Certainly, if a man was beaten up so badly he couldn't think, would go to whether or not he could give a voluntary statement; and this photograph should be direct testimony on his condition.

These objections clearly indicate a supposition that the jury, in some manner, would play a part in determining the issue of voluntariness. This supposition was not questioned, on record, by the trial judge.

As has been indicated above, only under the Massachusetts and New York rules is the jury called upon to determine the issue of voluntariness. As between a Constitutionally acceptable method, on one hand, and a Constitutionally impermissible procedure, on the other, this Court will not conclude that the trial judge, in Kinder's case, followed the latter, based on the facts now present.

■ The trial judge apparently passed on the issue of voluntariness, but still let the question go to the jury under a procedure used in application of the Massachusetts rule. Such being the case, however, the trial judge was bound to give proper jury instructions, United States v. Inman, supra at 352 F.2d 956. This he failed to do. Jury instructions, moreover, should have been given, even though there was no specific objection raised by the defense. *Ibid.* Hence, Kinder will be entitled to the federal habeas corpus relief outlined below.

Even if this Court were to have concluded that the judge in Kinder's state trial had not attempted to follow the Massachusetts rule, albeit, in an improper fashion, Kinder still would have been entitled to federal habeas corpus relief, although, as is also suggested below, not in the same manner.

If it were to have been concluded that the state trial judge had attempted to follow the New York rule, then the rationale in *Jackson* certainly would have to be applied in this case. Kinder might well have been entitled to federal habeas corpus relief simply because an unconstitutional procedure had been employed. Moreover, it would have been impossible to have looked at the jury's guilty verdict in Kinder's case and determined whether the jury had found the confession voluntary and relied upon it, or involuntary and supposedly ignored it. This would have undermined the second of the above mentioned three propositions on which *Jackson* was based. Furthermore, and with specific reference to the third of those propositions, the trial court's submission of the voluntariness question to the jury obviously could have been prejudicial to Kinder. Since there was a great abundance of evidence to cause the jury to believe that Kinder had committed the two murders, there was always the possibility that the jury would have automatically accepted the confession's voluntariness.

If, on the other hand, this Court were to have concluded that the state trial judge had attempted to follow the orthodox rule, then the violation of Kinder's Constitutional guarantees would have been no less obvious.

In Boles v. Stevenson, 379 U.S. 43, 45, 85 S.Ct. 174, 175, 13 L.Ed.2d 109 (1964), the Supreme Court, in dealing with a situation similar to the present one, where the state court had failed to hold a hearing or rule explicitly on the voluntariness of a confession, was of the following opinion:

> The practice in West Virginia, when an objection to a confession is interposed, is to hold a preliminary hearing out of the presence of the jury at which the trial judge fully determines the coercion issue. (Citing authority.) In light of this practice, we cannot ascertain on this record whether the trial judge declined to hold a hearing and declined to rule explicitly on voluntariness because he thought there

could not be any issue in light of defendant's not-guilty plea, because he thought the confession was in fact voluntary, or because he thought the objections were inadequate or untimely. Hence we do not know if the trial judge decided voluntariness one way or the other, and, if he did, what standard was relied upon. We think the procedures were not "fully adequate to insure a reliable and clear-cut determination of the voluntariness of the confession." (Citing Jackson v. Denno.)

Similarly, this Court can not ascertain from the record whether the trial judge, by failing to conduct a hearing, ruled explicitly that the confession was voluntary, or that defense counsel Sprouse's objections, above quoted, were inadequate or untimely.

This Court, therefore, would have had to grant federal habeas corpus relief to Kinder, even if it were conclusively established that the state court had followed the New York rule, or the orthodox rule, rather than the Massachusetts rule.

This decision is by no means meant to cast doubt on the Constitutionality of any rule by which the voluntariness of a confession is determined. The entire scope of this decision is that when a state court submits a confession to the jury in such a manner as to necessitate the conclusion that the state court has been following a practice comparable to the Massachusetts rule, and when, additionally, the state court thereafter fails to provide adequate jury instructions on the question of volutariness, United States v. Inman, supra at 352 F.2d 956, then the state court has failed to safeguard those Constitutional rights of the accused which were articulated in *Jackson*. The accused, therefore, must be retried in a proper manner.

A hearing conducted by the state judge to determine the voluntariness of the confession does not suffice in this particular case, for unlike Stevenson v. Boles, supra at 379 U.S. 45–46, 85 S.Ct. 174, and for reasons above stated, this is not the case of a state court, which in following the orthodox rule has failed to come to the mandatory determination, prior to submission to the jury. In a *Stevenson* type case, a new judicial hearing might suffice. But in the present case, where vital jury instructions were not given, nothing short of a new trial can satisfy Constitutional requirements.

In closing, this Court now directs its attention to the procedure which would best guarantee Kinder's Constitutional safeguards. Kinder shall remain in the custody of the Respondent for a period of thirty (30) days from the date of the filing of this memorandum, during which time the state may determine to retry him. If, at the expiration of the thirty days, the state has not taken the appropriate steps, Petitioner will be ordered released on federal habeas corpus. Respondent is further ordered to show cause, if any he has, within twenty (20) days after the filing of this memorandum, why an order granting the writ of federal habeas corpus should not be issued, in case the state does not pursue the corrective steps herein indicated.