Gibson, J.
On December 20, 1965, the defendant, a boy 16 years old, with a history of minor mental disturbance, was employed in the Jewish Community Center in Yonkers; and on that day there occurred in the center a fire that took 12 lives. Defendant has been convicted of arson causing the fire and of the murder of those whose deaths ensued.
The central issue concerns a confession which defendant gave to Zvi Almog, the director of the center. Other admissions and a confession given the police were summarily suppressed as *440 violative of the Miranda rules[1]; this as the result of the pretrial hearing of a motion addressed to the Grand Jury minutes and to the indictment. The suppression was predicated upon the court’s review of the Grand Jury minutes and neither then nor thereafter was defendant permitted to inspect these confessions taken by the police. There followed a Huntley hearing, concerned solely with the Almog confession, which the hearing court found ‘ ‘ voluntary and not psychologically coerced ’ ’.
The repeated denials of defendant’s applications to inspect the police confessions constituted serious error, requiring reversal of the judgment and a new trial; the denials depriving defendant of an opportunity to demonstrate that the activities and procedures of Almog and the police leading to the procurement of the separate confessions were so closely, if not, indeed, inextricably interrelated as to taint the Almog confession with the conceded defects of the police confessions from which the Almog confession seems to have flowed. The sequence of events strongly suggests a close liaison between the inquisitors and may be outlined as follows:
December 20, 1965 — The fire.
December 22, 1965—Almog reported to the police that defendant said that11 everytime there is a fire, he has been accused of it. ’ ’[2]
December 29, 1965 — Defendant was questioned by police and made inculpatory statements concerning his “ flicking ” of cigarettes around the center. Defendant told this to Almog also, after he had told the police. Almog urged an arrest.
January 5, 1966 — Almog requested that the police install recording equipment at the center as he wanted to question defendant. The police refused, apparently because, as a *441 result of the fire, there was no suitable electric outlet. At any rate, Almog secured a policeman to work incognito with defendant at the center. Five days of this produced no inculpatory statements which the policeman could report.
January 13, 1966—Almog suggested to the police that they set up a bogus board of directors meeting where he and policemen posing as the center’s board members could interrogate defendant. Almog felt he could arouse the boy’s sympathy if he felt that Almog might lose his job because of the fire.
January 14, 1966-—-The very next day, this “ meeting ” was held. Defendant admitted he had thrown cigarettes into a pail and had seen flames. After defendant’s departure, Almog again urged an immediate arrest.
January 19, 1966—defendant was observed by Almog in a police car. That night, apparently because of defendant’s disclosure of new information to the police, detectives asked Almog to come to the center and look for certain five-gallon cans, which Almog did find.
January 24, 1966—In the afternoon, Almog sent for defendant and had a conversation with him which was recorded. In this conversation defendant told Almog that he had kicked the flaming bucket down some stairs in the center and that he had already related this to the police. That evening defendant finally made a complete confession to the police and then called Almog from the police station. Almog went there, waited a few minutes and then encountered defendant *442 who said he had made a full confession. It seems either inexplicably strange or of great significance that after defendant had, in effect, confessed to 12 murders, the police released him to Almog who drove him home. At this time defendant told Almog what he said he had told the police — that on December 20 he had an urge to set a fire; that he left a coworker and went to the paint closet in the basement where he found a can marked ‘ ‘ highly flammable ”; that he took the can in the elevator to the third floor, went to the rear stairwell, ascended to the fourth floor and stacked chairs against an entrance door; that he then poured the contents of the can over objects in the stairwell, and also over other materials in the third floor balcony; that after the contents of the can had been disposed of he lit a match whereupon a 11 very big ” fire erupted.
It may be noted at this point that defendant testified at the trial and repudiated the alleged confessions.
Throughout the 33-day chain of interrogation, above outlined, the only admission Almog received in the first instance was the initial statement on December 22 that defendant said he was always accused of setting fires.' From that time on, all inculpatory statements given to Almog had been first given to the police, or to the police and Almog jointly. Thus, what Almog was receiving were rehashes of what the police had already illegally obtained. All during this period it is clear that Almog, if not an agent of the police in that he was directed by them (see People v. Leyra, 302 N. Y. 353), and this we do not decide, was at least in close collaboration with them, and it is also evident that the information illegally taken by the police was directly connected in each instance to information taken by Almog.
This, clearly, is not a case where a private citizen receives an original confession and then conveys it to the police; nor is it one where a later confession is untainted because of the lapse *443 of time and pressure (see United States v. Bayer, 331 U. S. 532, 540).
Thus, the basic issue remains whether the statements given Almog were tainted because they had already been given to the police. The test seems to be best stated in Wong Sun v. United States (371 U. S. 471, 488): “ [T]he more apt question in such a case is ‘ whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.’ Maguire, Evidence of Guilt, 221 (1959).”
Significant, also, is the language in Clewis v. Texas (386 U. S. 707, 710): “ On this record, we cannot hold that petitioner’s third statement was voluntary. It plainly cannot, on these facts, be separated from the circumstances surrounding the two earlier ‘ confessions. ’ There is here no break in the stream of events from the time Sunday morning when petitioner was taken to the police station to the time Tuesday morning some nine days later that he signed the statement in issue, sufficient to insulate the statement from the effect of all that went before.” In Glewis, too, it was remarked in a footnote, and by way of dictum:61 This Court has suggested that in some circumstances it may be a denial of due process for a defendant to be refused any discovery of his statements to the police. Cicenia v. Lagay, 357 U. S. 504, 510-511 (1958); Leland v. Oregon, 343 U. S. 790, 801-802 (1952). In light of our disposition of this case, however, we need not reach this question.” (p. 712, n. 8).
We need not consider, however, whether, in every case, the defendant’s statements must, on demand, be produced for his inspection if they are not to be proven by the prosecution.[3] In this case, disclosure is required because the evidence presented the clear probability that the Almog confession flowed naturally, perhaps inexorably, and in point of time immediately, from the police confession; and thus, it might be found, from police questioning and other police activities of one kind or another, pur *444 sued with Almog’s participation or close co-operation; with the result that the Almog confession might, upon full development of the record, be found to be the product of the same police interrogation and investigation that the hearing court, in the context of the police confessions, has already found illegal.
We need not pass on appellant’s additional assignments of error. Those of seeming substantiality are not such as to recur. The reversal and direction for a new trial which we find necessary, will, of course, permit a further Huntley hearing with respect to the Almog confession and thereupon and in the light of the evidence there produced, defendant can again move to inspect the Grand Jury minutes and to dismiss the indictment.
The judgment of the Appellate Division should be reversed and a new trial ordered.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Breitel and Jasen concur.
Judgment reversed, etc.

. Miranda v. Arizona (384 U. S. 436) was decided soon after defendant’s indictment.

. This might be found to be the only admission made to Almog which could be considered free from taint, as on this date, and because of this inculpatory statement, Almog requested the police to concentrate their investigation on defendant.

. The prosecution also successfully resisted the pretrial production of police reports and memoranda as premature, contending that under People v. Rosario (9 N Y 2d 286, cert. den. 368 U. S. 866) the prior statement of a witness is to he made available for purposes of cross-examination only; and, the police confessions having been suppressed, the officers concerned with them were not called as witnesses.